UNITED STATES of America,
Plaintiff–Appellant,

v.

ALPINE LAND AND RESERVOIR
CO., Defendant,

and

Truckee–Carson Irrigation District,
Defendant–Appellee.

UNITED STATES of America, Plaintiff,

v.

ALPINE LAND AND RESERVOIR
CO., Defendant,

and

TRUCKEE–CARSON IRRIGATION
DISTRICT, Defendant–Appellee,

v.

PYRAMID LAKE PAIUTE TRIBE OF
INDIANS, Defendant–Appellant.

Nos. 88–2539, 88–2542.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 9, 1989.

Decided Oct. 4, 1989.

Dirk D. Snel, Dept. of Justice, Washington, D.C., for plaintiff-appellant U.S.

Frederick G. Girard, Kronick, Moskovitz, Tiedemann and Girard, Sacramento, Cal., for defendant-appellee Truckee–Carson Irr. Dist.

Robert S. Pelcyger, Fredericks & Pelcyger, Boulder, Colo., for defendant-appellant Pyramid Lake Paiute Tribe of Indians.

Gordon H. DePaoli, Woodburn, Wedge & Jeppson, Reno, Nev., for defendants-intervenors-appellees David L. Matley and Christine L. Matley.

Before SCHROEDER and CANBY, Circuit Judges, and LEW,* District Judge.

SCHROEDER, Circuit Judge:

### Introduction

This appeal is yet another phase of the epic litigation over rights to the waters of the Carson and Truckee Rivers. Here, the United States together with the Pyramid Lake Paiute Tribe of Indians (the Tribe), the downstream user of the Truckee River, is pitted against the Truckee–Carson Irrigation District (TCID), which represents the owners of land within the Newlands Reclamation Project (the Project), the upstream users of the Carson and Truckee Rivers.

The Project has two divisions, the Truckee and the Carson. To supply the irrigators of the Truckee Division with water, some Truckee River water is diverted, through the Derby Diversion Dam and the Truckee Canal, from its natural flow into Pyramid Lake. The diverted Truckee water not used in the Truckee Division is then impounded at the Lahontan Reservoir, and distributed to the Carson Division. The Carson River runs eastward from the Sierra Nevada mountain range in California to the Lahontan Reservoir in Nevada, where it joins with water from the Truckee River Canal to irrigate the Carson Division. Thus, the Truckee River waters irrigate both the Truckee and Carson Divisions, while the Carson River waters irrigate only the Carson Division. The United States controls the Project's irrigation equipment, and TCID manages the Project pursuant to a contract with the United States. *Truckee–Carson Irr. Dist. v. Secretary of Dept. of Interior,* 742 F.2d 527, 530 (9th Cir. 1984), *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985).

Because any water diverted from the Truckee cannot be recovered for use at the Tribe's fishery at Pyramid Lake, the Tribe is vitally interested in limiting the diversion of Truckee River water. On the other hand, the landowners are interested in maximizing the amount of water diverted so that their farms can be sufficiently irrigated.

The question here is whether the United States government has the authority to set the basic guidelines for the classification of Project lands as either "bench" or "bottom." A great deal rides on these classifications for under the controlling court decrees, governing allocation of rights in the Truckee and Carson waters respectively, bench lands are entitled to a maximum water duty of 4.5 acre feet per acre/year (afa) and bottom lands receive a maximum of only 3.5 afa.[1] Rights to the Carson

---

* Honorable Ronald S.W. Lew, United States District Judge for the Central District of California, sitting by designation.

**1.** Water duty is the "amount of water an appropriator is entitled to use, including a margin for conveyance loss." *United States v. Alpine Land & Reservoir Co.,* 697 F.2d 851, 854 (9th Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

River waters are governed by the *Alpine Decree*. *United States v. Alpine Land & Reservoir Co.*, 503 F.Supp. 877 (D.Nev. 1980), *aff'd as modified*, 697 F.2d 851, 853 (9th Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Rights to the Truckee River waters are governed by the *Orr Ditch Decree*. *United States v. Adams (Orr Ditch)*, Equity Docket No. A3 (D.Nev. Sept. 8, 1944). Much of the history of these proceedings, which have continued since 1913, is related in *Nevada v. United States*, 463 U.S. 110, 113–18, 103 S.Ct. 2906, 2910–12, 77 L.Ed.2d 509 (1983).

The instant dispute arises in the context of the continuing proceedings in the *Alpine* litigation. In the *Alpine Decree*, the court retained continuing jurisdiction for water allocation and appointed a Watermaster. The decree directed the Watermaster to use historic practices, customs, agreements and decrees in the administration of the river. *Alpine Land*, 503 F.Supp. at 891, *aff'd as modified*, 697 F.2d at 851.

Unfortunately, neither the *Orr Ditch Decree* nor the *Alpine Decree* classified or described any method for classifying Project lands as either bench or bottom. The decrees themselves provide no criterion other than the use of historic practices to determine the appropriate water duty beneficial to the lands. *See Alpine Land*, 503 F.Supp. at 889–90. That omission gives rise to this dispute. The principal issue on appeal is whether the Department of Interior (DOI) or the district court bears the primary responsibility for formulating these initial classifications, subject to later resolution by the Watermaster of disputed classifications.

The Reclamation Act of 1902 (Act), 43 U.S.C. § 371 *et seq.* (1982), was intended to be a comprehensive legislative scheme which charged the Secretary of Interior (Secretary) to examine arid and semi-arid lands and survey them for development. *Henkel v. United States*, 237 U.S. 43, 49, 35 S.Ct. 536, 539, 59 L.Ed. 831 (1915); *see Nevada*, 463 U.S. at 128, 103 S.Ct. at 2917. To meet this responsibility the Secretary is charged with supervising the business related to the Bureau of Reclamation (BOR), 43 U.S.C. § 1457(6) (1982), which in turn is responsible for administering the reclamation of arid lands, 43 U.S.C. § 373a (1982). Thus, DOI has responsibility for overseeing the management of the Newlands Reclamation Project.

As part of DOI's responsibility for overseeing the management of the Project, the Secretary promulgated regulations in 1967 to initiate controls lacking in the past to limit the diversion of waters by TCID and thus make more water available for delivery to Pyramid Lake. 43 C.F.R. § 418.1(b) (1988). The regulations provide that they shall be in compliance with all the terms and conditions of both the *Orr Ditch* and *Alpine* decrees. 43 C.F.R. § 418.4(a) (1988).

In 1967, DOI began issuing operating criteria and procedures (OCAP) to govern the diversion of Truckee River flows to Lahontan Reservoir for use in the Project. In 1986, DOI proposed and eventually adopted OCAP requiring TCID to deliver water to the Project according to the classification of bench and bottom lands within the Project as indicated on maps prepared by the BOR. The OCAP also provided that objections to BOR's classifications of bench and bottom lands would be resolved by the Watermaster pursuant to the *Orr Ditch* and *Alpine* decrees. TCID's efforts in this proceeding have been directed toward overturning those regulations and substituting its own bench/bottom designations as the starting point for the Watermaster's determinations.

After several hearings and repeated comparisons of the bench/bottom classifications proposed by DOI and TCID the district court eventually ruled in favor of TCID, in what amounted to a *de novo* review of DOI's bench/bottom classifications. The government appeals, contending that its regulations were promulgated in the exercise of authority properly delegated to the agency, and should have been reviewed under deferential standards appropriate to such regulations.

The district court also ruled that the Tribe lacked standing to participate in any of the Watermaster's future determina-

tions regarding individual farm lands. The Tribe appeals that decision.

### Proceedings Below

Challenges to DOI's OCAP began in 1972 in the District of Columbia. *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F.Supp. 252 (D.D.C.1973). The court reserved jurisdiction to review annual OCAP. *Id.* at 261, 262. That case was transferred in 1985 to the district court in Nevada where it continues as *Pyramid Lake Paiute Tribe of Indians v. Hodel*, No. CV–85–0197–BRT. The district court in Nevada retains continuing jurisdiction to review the annual revisions of the OCAP. *See Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364 (9th Cir.1989).

The interim OCAP giving rise to this dispute were promulgated in 1986. They provided that the BOR's Bench and Bottom Land Classification Maps, as they might be periodically updated, would form the basis for determining the maximum water to be delivered to each parcel of Project land. The OCAP further provided that TCID could institute proceedings in the *Alpine* and *Orr Ditch* cases to obtain resolution of any dispute it had with the maps.

The effect of DOI's initial land classification was to designate as "bottom" 9,066 acres of land previously treated as "bench" and to designate 2,699 acres as "bench" previously treated as "bottom." These lands are primarily in the Carson Division.[2] Thus, pursuant to DOI's initial classifications, certain farms would be receiving substantially less water than they currently receive.[3]

Not surprisingly, in March of 1986, TCID filed a motion in *Pyramid Lake Paiute Tribe of Indians v. Hodel* to vacate the provision of the OCAP requiring the use of BOR's map to classify bench/bottom lands. On April 25, 1986, the district court issued an order directing TCID to file a petition in a separate action to resolve the dispute over the proper methodology to be used to determine which Project lands are bench and which are bottom.

Accordingly, on May 23, 1986, TCID instituted this proceeding by filing a petition for declaratory relief seeking to determine the proper criteria to be used to classify Project lands as either bench or bottom. Specifically, TCID sought a declaration that (1) DOI's classification of land as bench/bottom was arbitrary, unreasonable and not enforceable, and (2) water deliveries be based on historical practices.

On August 1, 1986, after hearing testimony and closing arguments from DOI, TCID and the Tribe, the district court ruled that the OCAP, upon which DOI's classification of bench/bottom lands was based, were "arbitrary and unreasonable and would not be enforced." In addition, the court held it was the intent of the *Alpine Decree* that once the classifications of bench/bottom lands were made that they be maintained with "considerable permanence and stability." The court held that TCID's map designating bench and bottom lands, rather than BOR's map, was the appropriate starting point to determine any classification of Project lands. The court also confirmed that any challenge to the classification of the lands must proceed before the Watermaster, as provided in the *Alpine Decree.*

---

**2.** Because diversions from the Carson River do not directly affect Pyramid Lake, the Tribe has sought and obtained judicial rulings that Carson River flows should be utilized whenever possible, before Truckee River flows, to supply the Project with its necessary water. *See, e.g., Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F.Supp. 252 (D.D.C.1973). Because Truckee River flows are utilized to irrigate lands in both the Truckee and the Carson Divisions, any decrease in water entitlements in the Carson Division would correspondingly decrease Truckee waters used in the Carson Division, and thereby increase the flow into Pyramid Lake.

**3.** The basis for current water deliveries was heavily contested below, with the district court changing its findings on a number of occasions. Apparently, the current water deliveries are based on actual water allocations made between 1925 and 1932, with post–1977 adjustments to reflect TCID's compliance with the *Orr Ditch* and *Alpine* decrees. The current water deliveries, which TCID proposed as the starting point of bench/bottom designations, were represented in the district court as TCID's Exhibit 6 map.

On August 8, 1986, the Tribe filed a motion for reconsideration of the court's oral ruling. On September 15, 1986, this motion was granted to explore whether the TCID map correctly identified the historical classification of bench and bottom lands and, if not, what adjustments had to be made to reflect the historical status of those lands.

On January 28, 1987, the court stated that both the TCID map and the BOR map were deficient in a number of respects. The court remanded the matter to DOI to prepare a revised map, and gave instructions regarding how the map should be revised. The court instructed DOI to develop a classification system that would call for the allocation of water based on soil and water table criteria, as well as provide for permanence and stability.

On July 24, 1987, DOI submitted a revised map, known as the DOI remand map. TCID also submitted a revised map. Again, DOI and TCID presented conflicting maps.[4] On September 10, 1987, several family farmers, including David J. Matley, were allowed to intervene in the proceedings. A three-day trial commenced on November 23, 1987.

On February 12, 1988, the district court entered its final order. After giving a synopsis of the litigation history, the court addressed the problem of classifying Project lands as either bench or bottom. The court found that DOI's remand map was deficient and also that the experts who testified on behalf of TCID and DOI at the remand hearing were unreliable. The court concluded that from 1977 to the present, water allocation to Project farmers had been based upon the practical needs of the farmers and that this experience, rather than DOI's classification scheme based on soil characteristics, was the only reliable

starting point for classifying Project lands. The court did not discuss the apparent inconsistencies between this conclusion and its 1987 order requiring the use of soil criteria. It also did not address the deficiencies in TCID's original map which it had noted in January of 1987, before remanding to DOI. The court held that DOI's map would not be used and that TCID's original map would be the appropriate starting point for classifying Project lands as bench or bottom.[5]

In addition, the court held that, despite inadvertent statements in earlier orders, the Tribe would not have standing in any future dispute submitted to the Watermaster because "[a] change of classification for a single farm unit will have an insignificant and legally non-existent effect on the rights of the Paiute Tribe." The United States and the Tribe timely appeal.

*Are Initial Bench/Bottom Classifications Within the Rulemaking Authority of DOI?*

■ The central issue in this case is whether DOI has rulemaking authority to develop a methodology to distinguish between bench and bottom lands within the Project and to apply those criteria to designate Project lands as bench or bottom, subject to the final determination of the Watermaster in the event of a dispute over a specific farming unit. The district court did not explain the basis for its essentially *de novo* review embodied in its final order.

TCID originally filed its petition seeking review of agency action under the deferential standards of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A) (1982). But it now argues that the Act's broad delegation of authority to the government

---

**4.** The primary differences are summarized as follows:

| Type of Designation | Number of Acres Designated | |
| --- | --- | --- |
| | DOI Remand Map | TCID Remand Map |
| "Bench" to "Bottom" | 11,000 | 2,000 |
| "Bottom" to "Bench" | 400 | 8,000 |

**5.** The district court also designated as "bottom" 2,000 acres of land previously treated as "bench" based on the post-trial briefs of all the parties, who agreed to the designation of those lands.

to regulate reclamation matters pursuant to section 10, 43 U.S.C. § 373 (1982), does not extend to any matters related to bench/bottom classification. TCID bases this argument on section 8 of the Act, 43 U.S.C. § 383 (1982), which provides that the maximum amount of water an appropriator is entitled to use is governed by state law. We disagree with TCID's present position.

Section 10 of the Act of 1902, 43 U.S.C. § 373, expressly grants broad rulemaking authority to DOI in connection with reclamation projects. Section 10 states:

> The Secretary of the Interior is hereby authorized to perform any and all acts and .to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect.

43 U.S.C. § 373.

Section 8 of the Act, 43 U.S.C. § 383, incorporates the concept of "federalism." The federalism provision provides that, notwithstanding any other provisions of the Act, state law governs the acquisition, distribution, and use of reclamation project water, and vested rights acquired thereunder, unless directly inconsistent with congressional directives. 43 U.S.C. § 383; *see California v. United States*, 438 U.S. 645, 677–78, 98 S.Ct. 2985, 3002, 57 L.Ed.2d 1018 (1978). 43 U.S.C. § 383 states:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

■ State law regarding the acquisition and distribution of reclamation water

applies if it is not inconsistent with congressional directives. *See California*, 438 U.S. at 668–69 n. 21, 672 n. 25, 674–75, 98 S.Ct. at 2997–98 n. 21, 2999 n. 25, 3000–01. Before *California*, it was believed that only acquisition of water rights (appropriation and condemnation) were subject to state law. *Id.* at 668–69 n. 21, 98 S.Ct. at 2997–98 n. 21. In *California*, however, distribution of water was also held to be subject to state law. *Id.* at 672 n. 25, 674–75, 98 S.Ct. at 2999 n. 25, 3000–01. Conversely, in the absence of congressional directives, DOI can regulate distribution, acquisition, and vested water rights if its regulations are not inconsistent with state law. *Cf. id.* at 672–78, 98 S.Ct. at 2999–3003.

Section 8 also expressly bases acquisition of water rights upon the concept of "beneficial use." It states that the "right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372. We have recognized that this constitutes a congressional directive mandating a beneficial use inquiry in place of any contrary dictate of state law. *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 855 (9th Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

TCID contends that section 8 somehow prevents the Secretary from promulgating regulations setting initial bench/bottom classifications. That contention finds no support in the language of the statute. Rather, section 8 sets forth standards that DOI is to follow when its activities pursuant to section 10 affect the acquisition of water rights. 43 U.S.C. § 383 ("the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with [state] laws").

Nor does our decision in *Alpine Land* stand for the proposition that DOI may not promulgate regulations of this nature. *Alpine Land* did not even involve DOI rulemaking. In that case, we upheld the as-

pect of the *Alpine Decree* which established the basic maximum 4.5 and 3.5 afa water duties for bench and bottom lands. *Alpine Land,* 697 F.2d at 857. We held that beneficial use is the measure of a water right, as mandated by section 8. *Id.* at 853. We refused to give any deference to contractual designations, recognizing instead the dynamic concept of beneficial use which varies according to changing conditions. *Id.* at 855. We did not purport to limit the scope of DOI's rulemaking authority.

In this case, we must follow the language of the Act as we previously interpreted it. We hold that under section 10 of the Act, the DOI is authorized to promulgate regulations establishing initial bench/bottom classifications, provided that the state law beneficial use standards mandated by section 8 are followed. We express no opinion as to whether these particular initial classifications either conform to or violate state law standards. We hold only that, in undertaking to establish an initial bench/bottom classification scheme, the DOI was acting within the scope of its regulatory authority under section 10.

■ This court has previously determined that OCAP are regulations of DOI and are reviewed under the arbitrary and capricious standard pursuant to 5 U.S.C. § 706(2)(A). *Truckee–Carson Irr. Dist. v. Secretary of Dept. of Interior,* 742 F.2d 527, 531–32 (9th Cir.1984), *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985). Here, however, the district court engaged in *de novo* review, with no deference to DOI.[6] TCID has failed to provide any satisfactory reason, and we have found none, why DOI's action in this case is not entitled to the deference afforded by the arbitrary and capricious standard of review.

Since the district court did not review the agency action under the appropriate standard, we remand for such review. *See*

*Pullman–Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982) ("where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue") (*citing Kelley v. Southern Pacific Co.,* 419 U.S. 318, 331–32, 95 S.Ct. 472, 480, 42 L.Ed.2d 498 (1974)). Accordingly, we decline the government's suggestion that we review DOI's classification system in the first instance and hold that it was not arbitrary and capricious.

■ "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Courts reviewing whether an agency action was arbitrary and capricious are limited to deciding whether there has been a clear error of judgment and whether the agency action was based upon consideration of the relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters. *Cf. Lara v. Secretary of Interior,* 820 F.2d 1535, 1542 (9th Cir.1987) (deferring to agency's expertise in determining what constitutes a mineral discovery).

If the district court eventually overturns this DOI action, under the appropriate standards, the matter should once again be remanded to DOI. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) (any deficiency found by the reviewing court should be corrected by the agency on remand because a reviewing court is not generally empowered to conduct a *de novo* review).

---

**6.** Although the district court did not explicitly state what standard of review governed its decision, the parties do not dispute, and the record indicates, that the court ultimately engaged in *de novo* review, notwithstanding its occasional use of the term "arbitrary" in its final order.

*The Tribe's Standing*

■ The district court's final order held that the Tribe would not have standing in any future dispute over land classification submitted to the Watermaster because "[a] change of classification for a single farm unit will have an insignificant and legally non-existent effect on the rights of the Paiute Tribe." The United States and the Tribe contend that the district court erred by prospectively denying standing to the Tribe. We agree.

■ Generally, persons have standing to sue if the challenged action has caused them "injury in fact" to an interest arguably within the zone of protected or regulated interests. *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). However, courts should not render advisory opinions upon issues which are not pressed before the court, precisely framed and necessary for decision. *United States v. Fruehauf,* 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961); *see also Arizona v. California,* 283 U.S. 423, 463–64, 51 S.Ct. 522, 529, 75 L.Ed. 1154 (1931) (when there is no immediate threat of injury the court will not consider hypothetical questions).

Here, the district court denied the Tribe standing to complain about a potentially injurious situation that may occur if many parcels of Project land are reclassified from bottom to bench, with the concomitant increase in the allocation of water to those parcels. The potential for this injury was recognized by the district court's final order, which stated:

> [The Tribe] is vitally interested in the instant bench-bottom land controversy because the aggregate acreage assigned a bench land water duty rather than a bottom land water duty may make a difference of thousands of acre feet of water available to Pyramid Lake. This is a significant interest.

The district court, however, proceeded on the assumption that the Tribe would not be adversely affected by the decision as to any particular farm because the incremental effect of changing an individual classification is minimal. The problem is that the total effect on the Tribe's water rights is ultimately the sum of the individual parts. The only way the Tribe can affect that sum is by participating in the determination of the proper bench/bottom classification for the individual farms. Accordingly, the order prospectively denying standing to the Tribe in future disputes must be reversed.

We reject the Tribe's request that the case be remanded to a different district court judge. The district court judge has handled this and other similar litigation for a number of years and is thus in the best position to resolve this dispute.

## CONCLUSION

The judgment of the district court is reversed and remanded with instructions to conduct a review under the arbitrary and capricious standard because DOI's initial classification of bench/bottom constituted appropriate agency action under section 10 of the Reclamation Act. The district court erred in ruling that the Tribe lacked standing to initiate or participate in future proceedings to reclassify individually owned farm units as bench/bottom land and on remand the district court is instructed to enter an order permitting such participation.

REVERSED AND REMANDED.