UNITED STATES of America,
Plaintiff–Appellant,

v.

CLIFFORD MATLEY FAMILY TRUST; David L. Matley and Christine L. Matley Family Trust; Matley Farms, Defendants–Appellees.

United States of America, Plaintiff,

v.

Alpine Land & Reservoir Company, a Corporation; et al., Defendants,

and

Pyramid Lake Paiute Tribe of Indians, Respondent–Appellant,

Nevada State Engineers, Real–Party–In–Interest–Appellee.

Nos. 01–15778, 01–15813.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 2002.

Filed Jan. 20, 2004.

James C. Kilbourne, Department of Justice, Washington, DC, argued the case for appellant United States. Katherine J. Barton & John L. Smeltzer, Department of Justice, Washington, DC, assisted on the briefs.

Robert S. Pelcyger, Louisville, CO, argued the case for appellant Pyramid Lake Paiute Tribe of Indians. Julia K. Miller, Louisville, CO, assisted on the briefs.

Gordon H. DePaoli, Reno, NV, argued the case for appellee Clifford Matley Family Trust, et al.

Before SNEED, McKEOWN, and PAEZ, Circuit Judges.

Opinion by Judge PAEZ; Partial Concurrence and Partial Dissent by Judge SNEED.

PAEZ, Circuit Judge:

This appeal involves another aspect of the many disputes over rights to water from the Newlands Reclamation Project (the "Project") in western Nevada. Appellants United States and Pyramid Lake Paiute Tribe of Indians (the "Tribe") appeal the district court's order affirming a ruling by the court-appointed Water Master to reclassify farm land located in the Project from "bottom land" to "bench land" for water allocation purposes. Although the Appellants raise several procedural issues, the heart of their challenge to the district court's order centers on the legal standard adopted by the court in 1994 when it authorized the Water Master to reclassify Project farm land from "bottom" to "bench" on the basis of a reduction in crop yield. We reject the procedural challenges to the Water Master's ruling, but conclude that the district court adopted an incorrect legal standard for evaluating a petition to reclassify project land. As we explain, the Water Master may approve a reclassification petition only when there has been a reasonably significant loss in crop yield. To apply the standard adopted by the district court would disregard the principles of beneficial use that must apply to the use of water from the Project. Accordingly, we reverse the district court's order and remand for further proceedings.

## BACKGROUND

The Pyramid Lake Paiute Tribe of Indians and the United States (collectively "Appellants") appeal the district court's order that affirmed the Water Master's reclassification of a farm near Fallon, Nevada from "bottom" land to "bench" land. This reclassification entitled the farm's

owners, the Clifford Matley Family Trust and the David L. Matley and Christine L. Matley Family Trust (the "Matleys"), to an additional acre-foot per acre of water each year from the Truckee–Carson water supply. Appellants contend that the district court's judgment must be reversed because the Water Master (1) conducted the proceedings on the Matleys' reclassification petition without following the procedures contemplated by the Federal Rules of Civil Procedure or the Federal Rules of Evidence, and (2) applied an incorrect legal standard in ruling on the petition. In order to provide some context for the parties' claims, we briefly review the history and development of the classification scheme.

In 1902, Congress passed the Reclamation Act, Pub. L. No. 57–161, 32 Stat. 388, which "directed the Secretary of the Interior to withdraw from public entry arid lands in specified Western States, reclaim the lands through irrigation projects, and then to restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself." *Nevada v. United States*, 463 U.S. 110, 115, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). The Department of the Interior (the "DOI") ultimately withdrew approximately 200,000 acres in western Nevada from the public domain to create the Newlands Reclamation Project, and relied on water from both the Truckee and Carson Rivers to irrigate this land. *Id.*

Because of competing demands for water from the Truckee and Carson Rivers and disputes over who owned the rights to Project water, years of litigation ensued,

ultimately resulting in the *Alpine*[1] and *Orr Ditch Decrees.*[2] These judicial decrees adopted basic guidelines for allocating water rights in the Truckee–Carson River system, classifying Project land as either "bench" or "bottom." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 208 (9th Cir.1989) ("*Alpine–Bench/Bottom*"). Bench lands have faster-draining soils than bottom lands, and are thus entitled to a maximum water duty[3] of 4.5 acre feet per acre/year ("afa"), while bottom lands receive a maximum of 3.5 afa. *Id.* The decrees did not, however, specify or describe any method for applying these classification schemes to Project lands.

In 1986, the DOI formulated and eventually adopted a classification scheme, based primarily on soil characteristics such as the "Available Water Holding Capacity of the First 5 Feet of Soil" ("AWHC5") and the "Seasonal High Water Table" ("SHWT"), which it mapped from soil surveys. The DOI's stated goal in promulgating this scheme and classifying each parcel was to allocate the Truckee–Carson river system's water more efficiently, thereby enhancing the region's agricultural productivity, while simultaneously providing more water for other uses.

The Truckee–Carson Irrigation District (the "TCID"), representing owners of land within the Project, including the Matleys, challenged that scheme in district court, offering a competing classification scheme based in large part on past allocations. Historically, and under the TCID's proposed scheme, the Matleys received 4.5 afa for their 320–acre alfalfa farm. Under the

---

1. *See United States v. Alpine Land & Reservoir Co.*, 503 F.Supp. 877 (D.Nev.1980), *aff'd as modified,* 697 F.2d 851, 853 (9th Cir.) ("*Alpine Decree*"). The *Alpine Decree* governs the rights to water from the Carson River. *Id.*

2. *See United States v. Orr Water Ditch Co.*, Equity No. A–3 (D.Nev. 1944) ("*Orr Ditch*

*Decree*"). The *Orr Ditch Decree* governs the rights to water from the Truckee River. *Id.*

3. Water duty is the "amount of water an appropriator is entitled to use, including a margin for conveyance loss." *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir.1983) (*Alpine I*).

DOI's plan, the Matleys' land was classified as "bottom" land, entitling them to only 3.5 afa. The district court "ruled in favor of TCID, in what amounted to a *de novo* review of DOI's bench/bottom classifications." *Alpine–Bench/Bottom,* 887 F.2d at 209. We reversed that ruling, holding that the Reclamation Act authorized the DOI "to promulgate regulations establishing initial bench/bottom classifications, provided that the state law beneficial use standards mandated by section 8 [of the Reclamation Act were] followed." *Id.* at 213. Accordingly, we concluded that the district court's review was limited to determining whether the DOI had acted arbitrarily or capriciously in adopting its proposed classification scheme. *Id.*

On remand, the district court upheld the DOI criteria and classification maps. The court also ordered the Water Master to administer the allocation of water under that scheme and to immediately and carefully consider "data collected by the water users in cooperation with agencies of the United States" to determine if reclassification is "necessary to maintain the integrity of current crop yields." *United States v. Alpine Land & Reservoir Co.,* No. D–185–HDM (D.Nev. Aug. 8, 1994) (the "1994 Order"). Significantly, the district court concluded that "[t]o the extent there may be a reduction in crop yield which can be attributed to the reclassification from bench to bottom land, then the federal water master is authorized to take such action as is appropriate to reclassify the lands from bottom land to bench land." *Id.* The district court, however, did not specify what procedures the Water Master was to follow or the standards to apply when considering reclassification petitions.

In response to the 1994 Order, the Water Master developed "Procedures and Policy for the Resolution of Disputes Regarding the Bench/Bottom Designation of Lands Within the Newlands Project" ("Protocol"), which created three methods by which a landowner could seek reclassification of his land. First, a landowner could demonstrate that, on the basis of DOI's own criteria, the new classification was incorrect. Alternatively, a landowner could demonstrate that the DOI's measurements of the available water-holding capacity in the top five feet of soil (AWHC5) and the seasonal high water table (SHWT) were inaccurate, and that correct measurements supported reclassification. Finally, a landowner could demonstrate that the DOI's classification and resulting decrease in water allocation had caused a decrease in crop yield. In late August 1996, the Matleys sought reclassification under this third method, alleging that the DOI's classification of their farm as "bottom" land had caused a reduction in their crop yield.

Upon receipt of the Matleys' petition, the Water Master provided the United States Bureau of Reclamation and the Natural Resources Conservation Service with copies of the petition. However, neither the Water Master nor the Matleys notified the Tribe or counsel for the United States that the Matleys had filed a reclassification petition. After obtaining a response from the federal agencies and additional information from the Matleys, the Water Master, without conducting a hearing, issued a report approving the Matleys' petition. The Tribe and counsel for the United States learned of the Matleys' reclassification petition only after the Water Master had issued his initial report. Both the Tribe and the United States objected to the Water Master's recommendations, and requested an evidentiary hearing in district court. The district court remanded the Matleys' petition to the Water Master with instructions to consider the Tribe's evidence, but authorized the Water Master to determine whether an evidentiary hearing was necessary.

On remand, the Water Master received the Tribe's evidence, but declined to hold an evidentiary hearing. After considering the Tribe's evidence, the Water Master issued an amended report restating his original findings and recommending that the Matleys' reclassification petition be granted. The district court adopted the Water Master's report and approved the reclassification of the Matleys' farm from bottom to bench land. The United States and the Tribe timely appealed the district court's ruling.

## I. Procedural Issues

### A.

■■■■ Appellants first argue that prior to issuing his report, Federal Rule of Civil Procedure 53 required the Water Master to permit discovery and to hold an evidentiary hearing.[4] Federal Rule of Civil Procedure 53(a) provides that "[t]he court in which any action is pending may appoint a special master therein." Rule 53(c) further states, in pertinent part:

> Subject to the specifications and limitations stated in the order [referring the proceedings to the master], the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order.

Fed.R.Civ.P. 53(c). An order referring a case to a special master is therefore the source and the limit of the master's duties and powers. *See Turner v. Orr,* 722 F.2d 661, 665(11th Cir.1984). Accordingly, we initially consider the district court's reference orders in this case to determine whether the Water Master was bound by the Federal Rules of Civil Procedure.

■■ The first order—the *Orr Ditch Decree*—provides that "[a] Water Master shall be appointed by this Court to carry out and enforce the provisions of this decree and the instructions and orders of the Court," and that "[a]ny person feeling aggrieved by any action or order of the Water Master may in writing and under oath complain to the Court." *See Orr Water Ditch Co.,* Equity No. A–3. The *Orr Ditch Decree* provides no further detail regarding the manner in which the Water Master is to carry out his duties or whether he is to follow the Federal Rules of Evidence or Civil Procedure in so doing. The second order—the *Alpine Decree*—contains identical text but further provides that "[a]ll disputes on the Carson River system involving the existence or ownership of water rights, the distribution of water or the transportation or measurement of water shall first be submitted to the Water Master for determination as a jurisdictional prerequisite to any complaint to the Court for relief." The *Alpine Decree* is silent, however, on whether the Water Master must adhere to the Federal Rules of Evidence or Civil Procedure. The third order—the 1994 Order—instructs the Water Master to consider petitions for reclassification, but similarly makes no mention of the procedures the Water Master must follow. Thus, although Rule 53(c) authorizes the Water Master to conduct evidentiary hearings, rule upon the admissibility of evidence, and to examine witnesses under oath, the reference orders in this case do not mandate that he do so.

As the text of the rule indicates, Rule 53 grants special masters broad authority "to regulate all proceedings in every hearing" and to "do all acts and take all measures

---

4. We review *de novo* interpretations of the Federal Rules of Civil Procedure. *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.,* 268 F.3d 829, 846 (9th Cir.2001) ("We also review de novo a district court's interpretation of the Federal Rules of Civil Procedure as an application of law.").

necessary or proper for the efficient performance of [their] duties." Fed.R.Civ.P. 53(c). Indeed, the only procedural requirement that Rule 53 appears to place on a special master is that, when the master determines that a hearing is necessary, the master "shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Federal Rules of Evidence for a court sitting without a jury." *Id.*

The history of Rule 53 supports a broad interpretation of a special master's authority to determine the appropriate procedures for completing his assigned duties. Rule 53 was derived from former Equity Rules 62 and 65. *See* Fed.R.Civ.P. 53 advisory committee notes. Equity Rule 62 established the "Powers of Master," providing that "[t]he master shall regulate all the proceedings in every hearing before him." Rules of Practice in Equity, 226 U.S. 628, 667 (1912).[5] Rule 62 further empowered a special master to "direct the mode in which the matters requiring evidence shall be proved before him; and generally to do all other acts, and direct all other inquiries and proceedings in the matters before him." *Id.* Thus, Equity Rule 62's grant of authority to "direct the mode" in which the special master could receive evidence afforded the master full discretion over whether to require production of books and papers or to require witnesses to appear for direct and cross-examination. The clear import of former Equity Rule 62 was that the special master had discretion to determine not only the kind of proof he required, but also the manner in which it would be presented.

Similarly, under former Equity Rule 65, entitled "Claimants Before Master Examinable by Him," the master was "at liberty to examine any creditor or other person

coming in to claim before him, either upon written interrogatories or *viva voce,* or in both modes, as the nature of the case [ ] appear[ed] to him to require." *Id.* at 668. Like Equity Rule 62, Equity Rule 65's use of the term "mode" referred to the manner in which the master could receive evidence, describing examinations upon written interrogatories or *viva voce* as different "modes" of examination. Thus, under former Equity Rules 62 and 65, a special master was exempt from the procedural requirements that the Equity Rules imposed on the district courts and a master had substantial discretion to determine the procedures that he would follow on a case-by-case basis. *Cf. Beckwith v. Malleable Iron Range Co.,* 207 F. 848, 850 (E.D.Wisc.1913) ("It has been suggested that, intermediate the commencement and termination of the proceedings before the master, the court ought not to give directions respecting the course of the procedure. Ordinarily this is true. . . ."); *Cold Metal Process Co. v. United Eng'g & Foundry Co.,* 92 F.Supp. 969, 970–71 (D.C.Pa.1950) ("Following the practice under Equity Rule 62, the master is given the power to regulate the proceedings before him and take all measures necessary for the proper performance of his duties under the order . . . [T]he court is generally loath to dictate to the master how to conduct proceedings before him, since such interference would tend to defeat the very purpose of reference." (quoting Moore's Federal Practice, Vol. 3, at 3134, 3135)).

As the advisory committee notes explain, Rule 53 grants special masters the same autonomy and discretionary authority that special masters enjoyed under the Equity Rules. *See* Fed.R.Civ.P. 53(c) advisory committee notes (describing Rule 53(c) as encompassing Equity Rules 62 and 65 with "slight modifications"). Because Rule 53

---

5. The Rules of Practice in Equity, as promulgated by the Supreme Court on November 4, 1912, are contained in the Appendix to Volume 226 of the United States Reports.

(like former Equity Rule 62) empowers the master to "regulate all the proceedings in every hearing before him," the advisory committee notes confirm that Rule 53 also grants substantial discretion to a special master to determine the kind of evidence the parties must submit and the manner in which it may be presented. Thus, it is within a special master's discretion whether to permit discovery or hold an evidentiary hearing in a particular case.

 In light of a special master's broad discretion to regulate the manner in which he will complete his duties, we reject Appellants' assertion that when a master is performing an adjudicatory function he must adhere to the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Appellants cite no case that supports this proposition, and our independent research reveals none. In sum, simply because a court may call upon a master to "aid [the] judge[ ] in the performance of specific judicial duties," *id.*, does not mean that a special master is required to follow the Federal Rules of Evidence or Civil Procedure, absent a reference order that so requires. We reject Appellants' argument to the contrary.

### B.

 Irrespective of the Water Master's supposed duty to follow the Federal Rules of Civil Procedure and the Federal Rules of Evidence, the Tribe contends that the Water Master violated its due process rights in failing to give the Tribe notice of the Matleys' petition for reclassification or to hold a hearing prior to issuing his report.[6] Although we agree that the United States Constitution may require the Water Master to conduct an evidentiary hearing

prior to issuing a ruling under certain circumstances, this is not such a case.

Indeed, the Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest," as "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation marks omitted). However, a careful assessment of the private and governmental interests at stake here and the nature of the existing procedures demonstrates that they were not constitutionally inadequate. *See id.* at 335, 96 S.Ct. 893(noting that the "identification of the specific dictates of due process generally requires consideration of three distinct factors").

It is true that the Tribe has a legitimate property interest in the additional water that the Matleys seek for their farm, *see Alpine–Bench/Bottom*, 887 F.2d at 214, and that by approving an allocation of additional water from the Carson River to the Matleys' farm in the Newlands Project, the Water Master permanently deprived the Tribe of any interest it had in that water. *See Mathews*, 424 U.S. at 341, 96 S.Ct. 893. The due process issue, however, is "the fairness and reliability of the existing [ ] procedures, and the probable value, if any, of additional procedural safeguards." *Id.* at 335, 96 S.Ct. 893. Thus, to address this issue, we review the basic procedure that the Water Master has established for consideration of a reclassification petition. *See id.* at 343–47, 96 S.Ct. 893.

Under the Water Master's Protocol,[7] the

---

6. We review the Tribe's constitutional due process argument *de novo*. *Krug v. Lutz*, 329 F.3d 692, 695 (9th Cir.2003).

7. The Protocol includes a "Procedure for Making Changes to Existing Bench/Bottom Land Designations Based on Reductions in Crop Yield." The "Procedure" provides that "[i]t will be the landowners [sic] responsibili-

Tribe must be notified that a reclassification petition has been filed and the Tribe may submit written objections to the petition.[8] The Tribe may also file objections to the Water Master's proposed findings and recommendations. The Protocol does not require the Water Master to allow the parties to conduct discovery or to hold an evidentiary hearing.

■ The Tribe contends that the Protocol procedure denies it the opportunity to obtain meaningful review of its property interests because it does not afford the Tribe an evidentiary hearing at which it may cross-examine witnesses. What the Tribe overlooks is that, although due process guarantees "some kind of hearing ... at some time before a person is finally deprived of his property interests," *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), a full evidentiary hearing is not required in every case, *see Mathews*, 424 U.S. at 333–34, 96 S.Ct. 893; *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Rather, the type of hearing required depends on the circumstances. *Mathews*, 424 U.S. at 333–34, 96 S.Ct. 893. Weighing the "administrative burden and other societal costs that would be associated with requiring, as a matter

of constitutional right, an evidentiary hearing upon demand in all cases," *Mathews*, 424 U.S. at 347, 96 S.Ct. 893, we conclude that the Water Master is not required to hold an evidentiary hearing replete with witnesses and cross-examination prior to ruling on a reclassification petition.

Here, the Tribe ultimately received notice that the Matleys had filed a reclassification petition, and it was able to submit extensive, detailed objections to the Matleys' petition, albeit after remand by the district court. Although the Tribe was not permitted to conduct discovery, it obtained analyses from two experts who critiqued the findings of the Matleys' expert, Donald Grimes. On the basis of their analyses, the Tribe submitted sophisticated and detailed written objections to both the Water Master and the district court, attacking the Water Master's findings and the methodology he used to reach those findings. These objections demonstrate that the Tribe was given a meaningful opportunity to protect its property interests in this case. Accordingly, we hold that in rendering his final report the procedure followed by the Water Master was constitutionally adequate and did not deprive the Tribe of its property interest in Project water without due process of law.

---

ty to gather information that provides proof that the reduction in water duty ... is the primary reason for reductions in crop yields." It further provides that "[t]he information needed to provide proof are [sic] related to crop management factors such as, but not limited to, soil fertility, harvest efficiency, irrigation and drainage management, weather conditions, weed contend, etc. These factors must be compared to historically recorded crop management factors so the Watermaster can make a determination."

8. As initially adopted, the Protocol did not include an explicit provision that required the petitioner or Water Master to notify the Tribe or counsel for the United States that a peti-

tion for reclassification had been filed. However, as a result of our decision in *Alpine–Bench/Bottom*, the Protocol must be read to include such a provision. Indeed, after the district court denied the Tribe standing to participate in the reclassification proceedings in 1988, we reversed its order and instructed the district court "to enter an order permitting [the Tribe's] participation" on remand. *Alpine–Bench/Bottom*, 887 F.2d at 214. In so holding, we noted that "the total effect on the Tribe's water rights is ultimately the sum of the individual parts. The only way the Tribe can affect that sum is by participating in the determination of the proper bench/bottom classification for the individual farms." *Id.*

## II. Reclassification Standard

■ Procedural issues aside, Appellants also contend that the Water Master applied the wrong legal standard in evaluating the Matleys' reclassification petition, and that the district court compounded that error when it adopted the Water Master's report.[9] We agree.[10]

■ The Reclamation Act provides that "beneficial use shall be the basis, the measure, and the limit of the right" to use water acquired under its provisions. 43 U.S.C. § 372. "By the terms of the statute, [therefore,] beneficial use is the 'basis' and 'measure' as well as the 'limit' of water rights; it sets the maximum water duty, but, under the statute, it is also the necessary rationale and source of the right." *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 853 (9th Cir.1983) (*Alpine I*). The standard for reclassification therefore must comply with the principles of beneficial use, as the Reclamation Act "constitutes a congressional directive mandating a beneficial use inquiry in place of any contrary dictate of state law." *Alpine–Bench/Bottom*, 887 F.2d at 212; *see also California v. United States*, 438 U.S. 645, 668 n. 21, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (noting the binding "congressional directive" that "the water right must be . . . governed by beneficial use").

■ In describing the principles of beneficial use, we explained that "[t]he major conceptual tool for implementing beneficial use is the water duty, which is the amount of water an appropriator is entitled to use, including a margin for conveyance loss." *Alpine I*, 697 F.2d at 854. The water duty

> is that measure of water, which by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions.

*Id.* (internal quotation marks omitted). Although this definition explicitly contemplates a measure "adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon," we must read this definition in a manner consistent with the principles of beneficial use.

Indeed, in defining "beneficial use" as the "general rule that water is beneficially used (in an accepted use such as irrigation)

9. We respectfully decline to follow the approach suggested by the dissent. No party argued that a significant crop yield reduction could not be considered as a factor in the reclassification scheme. As the United States' explained in its supplemental brief:

> Given the district court's unique role and authority with respect to reclassification, the United States did not and does not contend that the district court exceeded its authority in instructing the Water Master to consider yield reductions when reviewing petitions for reclassification. Although the bench/bottom criteria do not explicitly authorize reclassification based on evidence regarding crop yield, such evidence is relevant to the overriding question of beneficial use.

Similarly, the Tribe argued that the crop yield reduction must be significant, not that crop yield reduction should be wholly irrelevant to the classification decision. Accordingly, because we were not asked to hold that the 1994 order erroneously included reduction in crop yield as a basis for reclassification, we confine our analysis to the narrow issue raised by the appellants, i.e.—whether a reduction in crop yield must be reasonably significant to comport with the principle of beneficial use. We answer that question in the affirmative.

10. We review *de novo* the Water Master's interpretation of the substantive standards governing the Matleys' petition. *See Swoboda v. Pala Mining Inc.*, 844 F.2d 654, 656 (9th Cir.1988).

when it is usefully employed by the appropriator," we adopted two qualifications: (1) "the use cannot include any element of 'waste' which, among other things, precludes unreasonable transmission loss and use of cost-ineffective methods," and (2) "the use cannot be 'unreasonable' considering alternative uses of the water." *Alpine I,* 697 F.2d at 854. Thus, even where the "application of additional water over the water duty awarded ... would provide some benefit to the appropriator," we have upheld the original water duty when "the gain was so small (compared to the amount of water necessary to bring it forth) that the additional increment of water would not be economically applied." *Id.* (internal quotation marks omitted). These qualifications are consistent with the *Alpine Decree*'s provisions for an individual farm to divert up to its designated duty, "subject to the obligation[ ] ... to divert and use water only at such times as needed and only in such amounts as may be required for actual, reasonably economical beneficial use."

Here, the Matleys rely on a provision in the district court's 1994 Order to argue that the Water Master properly determined that beneficial use entitles them to the maximum crop yield. Specifically, they note the district court's reliance on the DOI's 1992 report supporting the bench/bottom classification scheme which contemplated

> that there must be an appropriate water allowance for future changes to the bench and bottom land classifications based upon the collection of factual data by the water user. To the extent there may be a reduction in crop yield which can be attributed to the reclassification from bench to bottom land, then the federal water master is authorized to take such action as is appropriate to reclassify the lands from bottom land to bench land.

Indeed, the district court further stated that

> [t]herefore a critical component of the Secretary's findings is that any water user has the right to apply for and secure changes in bench and bottom land classifications. The data collected by the water users in cooperation with agencies of the United States should be given immediate and careful consideration should reclassification be necessary to maintain the integrity of current crop yields.

However, although the district court accounted for "a reduction in crop yield" and "the integrity of current crop yields," the Matleys' narrow reading of the 1994 Order does not comport with the principle of beneficial use. The district court's 1994 Order cannot be read to allow reclassification in every case where a landowner, such as the Matleys, can show a reduction in crop yield, however *de minimis.* Instead, reclassification is appropriate only in cases where a yield reduction is reasonably significant in light of the applicable beneficial use standard.

█ Under this standard, a Project landowner is not guaranteed an appropriation of water that would ensure the maximum crop yield. Although we have defined the water duty as the amount of water that is reasonably required, without wastage, to produce a "maximum" crop, *see Alpine I,* 697 F.2d at 854, beneficial use does not permit a Project landowner to use water in a manner that is "unreasonable" in light of alternative uses. *Id. Alpine I* made clear that a landowner is not entitled to a higher water duty if the marginal gain is too small to justify the use compared with the overall amount required for use and the benefits that could be gained were that amount of water applied elsewhere. *Id.* Thus, the qualifications on beneficial use provide a limiting

principle that undermine both the Matleys' and the Water Master's interpretation of the 1994 Order.

Indeed, the Water Master, in granting the Matleys' petition, mistakenly stated that "[t]he [district court's 1994] Order recognizes that state law beneficial use standards, which allow sufficient water for maximum crop production, must be satisfied," apparently relying on a statement in the Matleys' Petition for Reclassification. Because the Water Master articulated this standard without considering beneficial use, and because the district court affirmed the Water Master's findings without addressing the beneficial use principle, we conclude that the district court's order affirming the Water Master's approval of the Matleys' reclassification petition must be reversed. We also conclude that the district court's 1994 Order must be interpreted to encompass the beneficial use standard, and thus hold that the Water Master may consider reduction in crop yield in evaluating a petition for reclassification, but any reduction must be reasonably significant in light of the prohibitions against waste and unreasonable applications of water in order to justify a reclassification from "bottom land" to "bench land." Because the Water Master did not make such an evaluation before reclassifying the Matleys' farm, we reverse and remand to allow the district court or the Water Master to reconsider the Matleys' reclassification under the appropriate standard.

### III.

In sum, we hold that the Water Master is not required to follow the Federal Rules of Evidence or Civil Procedure when conducting reclassification proceedings nor is the Master required to hold an evidentiary hearing prior to granting a petition. Because the Tribe was ultimately notified of the Matley's petition and was allowed to submit extensive evidence and objections to the Waster Master and the district court, the Tribe was not denied due process of law. However, because the Water Master applied an incorrect standard in granting the Matley's petition, and the district court failed to correct the Water Master's error, we reverse the district court's order and remand so that the district court or the Water Master, if directed by the district court, may reconsider the Matley's reclassification petition in light of the standard we announce today.

**REVERSED** and **REMANDED.**

SNEED, Circuit Judge, Concurring and Dissenting:

Although I agree with the majority's conclusions regarding the procedural issues, I disagree with its resolution concerning the legal standard adopted by the district court authorizing the Water Master to reclassify farm land from "bottom" to "bench" on the basis of a reduction in crop yield. Instead of adopting a standard that, while different from the district court's, conflicts with the system of reclassifying farm lands set forth by the Department of the Interior ("DOI"), I suggest that the case should be remanded to the district court to conduct the review—that it was already ordered to perform and failed to properly conduct—of the DOI's system.

The task assigned to the district court in 1989 was to determine whether the DOI had acted arbitrarily or capriciously when it promulgated its Operating Criteria and Procedures ("OCAP"). *See United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 214 (9th Cir.1989). The OCAP prescribes not only a method for initially classifying Project lands, but also includes the explicit instruction that "[w]hen the Federal Watermaster considers changing any portion of the initial map, the specific criteria identified herein should be ap-

plied." *See* Bureau of Reclamation, U.S. Dept. of the Interior, Initial Bench & Bottom Land Map & Criteria 4 (rev. January, 1992) ("Initial Bench/Bottom Map & Criteria").[1] The criteria to which this instruction refers are based solely on soil factors such as the AWHC5 and SHWT. To eliminate any ambiguity as to the permissible basis for reclassification, the report states, "[i]f in the future, the Federal Watermaster considers petitions to change bench and bottom land designations, then documented exceptions to the reported SCS values of the AWHC5 or SHWT should be the justification." *Id.* at 22. To aid the Water Master in this task, the report also provides an analysis of six hypothetical petitions for a change of classification. *Id.* at 24–26. Each hypothetical petition is resolved using soil factor evidence, such as the SHWT, the AWHC5 and the amount of surface runoff. *Id.* Thus, the OCAP are unambiguous in their instructions that reclassifications should be based solely on soil factors.

The district court held that the OCAP findings were not arbitrary or capricious. However, in its order upholding the OCAP it directed the Water Master to entertain petitions for reclassification on both the grounds contained in the OCAP and on an alternate ground not contained in the OCAP. Specifically, the district court ordered the Water Master to consider reclassification if an individual farmer could show that the DOI's scheme had lowered his crop yield.

This alternate ground not only contravened the OCAP's explicit instructions, but also was inconsistent with existing geological conditions. The DOI arrived at its soil factor-based methodology after extensive soil and geological surveys and crop studies that showed that "[t]he [Newlands] Project has long been plagued by reoccurring subsurface drainage problems resulting from geologic conditions and irrigation practices. Soon after the operation of the Project began, applications of irrigation water raised water tables to levels damaging for crop production ..." *Id.* at 2. This is so because "in general the area is an ancient lake bottom," which acts like a "large bowl filled with sediment and water." *Id.* at 11–12. As a result, the soil drains poorly. *Id.* Consequently, the water table rises until it saturates the "root zone" and damages the crops. *Id.* at 19.

---

1. The OCAP provide that:

 [t]he specific criteria used to distinguish bench and bottom land soils primarily relies on information contained in the Soil Conservation Service's (SCS) *Soil Survey of Fallon Fernley Area, Nevada, Parts of Churchill, Lyon, Storey, and Washoe Counties,* January 1975 (SCS soil survey) (exhibit 7). The criteria used have two aspects which are: (1) the available water-holding capacity in the top 5 feet of the soil profile (AWHC5), and (2) the seasonal high water table (SHWT).... If the average AWHC5 for the soil in a field is equal to or greater than 8 inches, the field is bottom land. If the average SHWT in a field is equal to or less than 5 feet, then the field is bottom land. If the average AWHC5 for the soil in a field is less than 8 inches and the average SHWT is greater than 5 feet, then the field is bench land.

*Id.* at 4–5. They further explain the methodology the DOI used in arriving at AWHC5 and SHWT values for each farm in the Project, *Id.* at 17–18, and the method used in assigning designations (as bench or bottom) to particular parcels:

 [t]he initial map was developed by applying the criteria on a majority acreage basis for 1/4–1/4 sections, lots, and fields containing both bench and bottom land soils. Each 1/4–1/4 section or lot was identified as either bench or bottom land unless a field with a different designation crossed the 1/4–1/4 section or lot boundary. In those cases the 1/4–1/4 section of lot was subdivided around the field perimeter. Each field is assigned only one designation.

*Id.* at 5. The report thus contains both the criteria for classifying land and a method for applying the criteria to specific parcels.

As every farmer knows, even a few days of saturation in the "root zone" can damage alfalfa plants. *Id.* As the DOI explained: "Implementation of the initial map will result in a reduction in irrigation applications, a reduction in subsurface drainage problems, and increased crop yields." *Id.* at 3.

The OCAP clearly reflects the DOI's judgment that the Project's crop yields had been depressed for decades due to over watering. The OCAP explicitly sought to remedy this problem by decreasing the amount of irrigation water. The district court's order providing for reclassification when a decrease in water had reduced crop yields, constitutes a substitution of its judgment for that of the agency on a technical issue of how, in the long run, to maintain or enhance current crop yields. Indeed, if the DOI is correct in its view that current crop yields are depressed due to over watering, then the district court's holding will exacerbate the very problem it purports to solve.

Under the district court's order, a farmer may seek reclassification if he can show to the Water Master's satisfaction that his reduced water duty (under the DOI's scheme) has injured his crop yield.[2] If he is successful, he will then apply more water to his land and thereby damage his own crops and probably those of his neighbors. Under the logic of the district court's order, those neighbors then would be entitled to reclassification and an increase in water duty. So the problem of the area would worsen.

It is apparent that the difference between the OCAP and the district court reflects a disagreement between the DOI and the district court as to the root cause of depressed crop yields. It is the DOI's belief that the cause is too much water. The district court appears to believe that the cause is too little water. Congress entrusted this judgment to the DOI.[3] The district court was empowered only to determine whether the DOI exercised that judgment appropriately. It did not confine itself to that role.

Accordingly, the majority errs in modifying a standard that the district court lacked authority to create. Rather than tinkering with that standard, the case should be remanded and the 1994 order vacated so that the district court may conduct the review it failed to properly conduct in the first instance.

---

2. It is appropriate to note at this point that the district court provided the Water Master no guidance on when a reduction in crop yields warrants reclassification.

3. The district court's addition to the OCAP may be construed as a decision by that court that the DOI had failed to consider an important aspect of the problem, namely, whether the OCAP provided any relief for farmers who believed their crop yields had been injured by the designation of their farms as "bottom" land. This would be a difficult row to hoe, for the DOI did in fact consider the impact of its methodology on individual farmers. In addition, the DOI clearly expressed its opinion that rectifying the over watering problem plaguing the Newlands Project required the participation of all the Project's farms. In any case, if this was the district court's position, then its duty was to invalidate the OCAP, not amend them. *See e.g. Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. National Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir. 2001).