**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH R. BUCKINGHAM,
              *Plaintiff-Appellant,*

              v.

SECRETARY OF THE U.S.
DEPARTMENT OF AGRICULTURE;
CHIEF OF THE FOREST SERVICE;
REGIONAL FORESTER FOR THE
INTERMOUNTAIN REGION OF THE
FOREST SERVICE; FOREST
SUPERVISOR OF THE HUMBOLDT-
TOIYABE NATIONAL FOREST OF THE
FOREST SERVICE; DISTRICT RANGER
FOR THE SANTA ROSA RANGER
DISTRICT OF THE FOREST SERVICE,
              *Defendants-Appellees.*

No. 09-15893

D.C. No.
3:07-cv-
00073-BES-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued and Submitted
March 1, 2010—Portland, Oregon

Filed April 29, 2010

Before: Richard A. Paez, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

Therese A. Ure, Schroeder Law Offices, P.C., Portland, Oregon, John E. Marvel, Marvel & Kump, Ltd., Elko, Nevada, and Wm. Alan Schroeder, Schroeder & Lezamiz Law Offices, LLP, Boise, Idaho, for the plaintiff-appellant.

Daniel G. Bogden, United States Attorney, and Roger W. Wenthe, Assistant United States Attorney, Las Vegas, Nevada, for the defendants-appellees.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiff Kenneth R. Buckingham filed a complaint in the District of Nevada against the Secretary of the United States Department of Agriculture, the Chief of the United States Forest Service, the Regional Forester for the Intermountain Region, the Forest Supervisor for the Humboldt-Toiyabe National Forest, and the District Ranger for the Santa Rosa Ranger District (collectively, the Forest Service). Buckingham sought judicial review, pursuant to the Administrative Procedure Act (APA), of the Forest Service's decision to cancel his permit to graze cattle in the Santa Rosa Ranger District of the Humboldt-Toiyabe National Forest, claiming, *inter alia*, that the Forest Service: (1) erroneously enforced a permit lacking clearly defined pasture boundaries; (2) violated Buckingham's Fifth Amendment procedural due process rights by not affording him adequate pre- or post-deprivation procedures; (3) failed to give him notice and an opportunity to demonstrate or achieve compliance as required by the APA, 5 U.S.C. § 558(c); and (4) improperly considered Buckingham's prior history of non-compliance with his permit in making its decision. The district court upheld the Forest Service's decision, and this appeal followed. We have jurisdiction to review this decision under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

### I.  Legal Background

The Forest Service manages 155 national forests, 20 national grasslands, and 8 land utilization projects on over 191 million acres of land within the United States (collectively, the National Forest System). 36 C.F.R. § 200.1. The Forest Service administers the National Forest System under the National Forest Management Act of 1976 (NFMA), 16

U.S.C. §§ 1600-1614, which "establishes a two-step process for forest planning," *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 957 n.1 (9th Cir. 2005). First, the Forest Service develops a land and resource management plan (Forest Plan) for each unit of the National Forest System. *Id.* (citing 16 U.S.C. § 1604(a)). Second, "the Forest Service implements each Forest Plan by approving or disapproving site-specific actions." *Id.*

The Forest Service authorizes grazing within the National Forest System on "allotments" pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-1787. "Allotments" are "designated area[s] of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1). The Forest Service divides allotments into smaller areas, referred to as "units" or "pastures." *Or. Natural Desert Ass'n v. U.S. Forest Serv.* (*ONDA*), 465 F.3d 977, 979 n.2 (9th Cir. 2006).

The Forest Service exercises its authority under the FLPMA to permit grazing on allotments by way of three different types of site-specific actions, *see ONDA*, 465 F.3d at 979-80, all of which must be consistent with the applicable Forest Plan, *see* 16 U.S.C. § 1604(i). First, the Forest Service issues grazing permits, which are "document[s] authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5); *see also* 43 U.S.C. §§ 1702(p), 1752(a). Typically, a grazing permit will specify: "(1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use." *ONDA*, 465 F.3d at 980. The standard term of a grazing permit is ten years. *See* 43 U.S.C. § 1752(b); 36 C.F.R. § 222.3(c)(1). The Forest Service "is authorized to cancel, modify, or suspend grazing and livestock use permits in whole or in part" if the permittee fails to comply with the requirements of his or her permit, or with governing regulations. *Id.* § 222.4(a)(4).

Second, the Forest Service develops an "allotment management plan" (AMP), which is "a document that specifies the

program of action designated to reach a given set of objectives" as to a specific allotment, including "the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands, involved." *Id*. § 222.1(b)(2); *see also Natural Res. Def. Council, Inc. v. Hodel*, 618 F. Supp. 848, 859 (E.D. Cal. 1985) (characterizing an AMP as " 'the penultimate step in the multiple use planning process' and as 'basically land use plans tailored to specific grazing permits' ") (quoting George C. Coggins, *The Law of Public Rangeland Management IV: FLPMA, PRIA, and the Multiple Use Mandate*, 14 Envtl. L. 1, 23-24 (1983)). The Forest Service incorporates the AMP into the applicable grazing permit unless it has not prepared an AMP or it determines that an AMP is unnecessary, in which case it includes in the permit itself "such terms and conditions as [it] deems appropriate for management of the permitted or leased lands." 43 U.S.C. § 1752(e).

Third, the Forest Service develops and issues annual operating plans (AOPs) or instructions (AOIs). "Whereas the AMP relates the directives of the applicable [F]orest [P]lan to the individual grazing allotment . . . the AOI annually conveys these more long-term directives into instructions to the permittee for annual operations." *ONDA*, 465 F.3d at 980. "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit . . . ." *Id*. at 980-81. The Forest Service typically incorporates the AOP or AOI, like an AMP, into the grazing permit, which then "governs the permit holder's grazing operations for the next year." *Id*. at 980.

## II.   Factual and Procedural Background

Buckingham resides in Paradise Valley, Nevada, and owns and operates a livestock operation located within the Humboldt-Toiyabe National Forest. In 1983, the Forest Ser-

vice issued Buckingham a grazing permit for land in the But-termilk Allotment of the Humboldt-Toiyabe National Forest's Santa Rosa Ranger District. The Forest Service attached a map of the Buttermilk Allotment to the 1983 permit, reflect-ing the Allotment's boundaries and those of its various pas-tures. From 1983 through 1988, the Forest Service issued an AOP annually, specifying the pastures Buckingham could use within the Buttermilk Allotment (e.g., Spring City, Butter-milk, Black Ridge, Lye Creek, Buttermilk Meadows), the number of animals permitted in those pastures, and the dates of use for those pastures. The Forest Service expressly incor-porated each AOP into Buckingham's applicable grazing per-mit.

Buckingham renewed his grazing permit in 1989 and 1999. The 1989 permit included a map showing the relevant bound-aries for the Buttermilk Allotment, but the 1999 permit did not. Nevertheless, the Forest Service issued an AOP or AOI annually from 1989 through 2004, identifying the specific pastures where Buckingham was authorized to graze his live-stock and describing the uses he was authorized to make of those pastures. Some of the AOIs or AOPs, which the Forest Service expressly incorporated into Buckingham's permit, contained maps of the Buttermilk Allotment.

Beginning in January 1998, Buckingham commenced what became a persistent pattern of permit violations. Between Jan-uary 1998 and June 2004, the Forest Service issued at least seven notices of non-compliance to Buckingham because he had grazed his cattle in rested pastures. In addition to those notices of non-compliance, the Forest Service twice sus-pended and once cancelled 25 percent of Buckingham's authorized use within the Buttermilk Allotment because he grazed his livestock in rested units and on the Allotment after the authorized "off date."

In June 2004, the Forest Service issued a second partial cancellation of Buckingham's grazing rights under his 1999

grazing permit. The Forest Service informed Buckingham that under the 2004 AOI, he was permitted to graze 1098 cow/calf pairs in the Spring City Unit between May 22 and June 22, and then to graze them in the Buttermilk Unit from June 23 to August 28. Eight days before the authorized entry date, however, the District Ranger discovered 67 cow/calf pairs that belonged to Buckingham grazing in the Buttermilk Unit, and "[t]he forage use in the area indicate[d] these cattle [had] been in [that] unit for quite some time." The District Ranger began his decision by noting Buckingham's "recent and long-term history of non-compliance" and the Forest Service's "initial, but unsuccessful attempts to resolve this situation" with Buckingham. According to the District Ranger, "[i]t [was] apparent to [him] that [Buckingham] [had] little regard and [made] little effort to comply with the terms and conditions of [his] [AOI] and [his] term grazing permit." As a result, the Forest Service cancelled 25 percent of Buckingham's authorized use under his grazing permit. The Forest Supervisor and Regional Forester affirmed the District Ranger's decision.

As a result of the Forest Service's June 2004 cancellation decision, it replaced Buckingham's 1999 permit with a revised permit incorporating the partial cancellation. Under the revised permit, the Forest Service authorized Buckingham to graze only 824 cow/calf pairs, rather than the previously authorized 1098 cow/calf pairs, during the grazing season. As with the 1999 permit, the revised permit did not include a map of the Buttermilk Allotment or its pastures.

In May 2005, the Forest Service issued its AOI for the 2005 grazing season. The 2005 AOI designated the Spring City and Buttermilk Units as rested units and prohibited all grazing on the Buttermilk Meadows Unit.

On July 25, 2005, the Forest Service issued a notice of non-compliance to Buckingham because the District Ranger had

observed 42 cow/calf pairs belonging to Buckingham in the Buttermilk Meadows Unit, where grazing was prohibited.

On August 18, 2005, the Forest Service sent Buckingham a decision letter regarding his permit compliance. The letter highlighted the previous notice of non-compliance delivered to Buckingham on July 25, 2005, which had required him to remove all his cattle from the Buttermilk Meadows Unit by July 27, 2005. The letter then informed Buckingham that the District Ranger had confirmed on two separate inspections, one on August 12 and another on August 13, that Buckingham still had livestock grazing in the Buttermilk Meadows Unit. As a result, the District Ranger suspended 25 percent of Buckingham's authorized use under the 2005 permit for three years. It also instructed him to remove all his livestock from the Buttermilk Meadows Unit that same day.

On September 9, 2005, the Forest Service issued another notice of non-compliance to Buckingham. Despite the July 25 and August 18 notices, and the related suspension, the Forest Service confirmed that Buckingham's cattle were still grazing in the Buttermilk Meadows Unit on August 23 and August 25, 2005. Once again, the notice required Buckingham to remove his cattle immediately. The Forest Service reminded Buckingham that he had "a repeat and ongoing problem" with compliance and instructed him to undertake appropriate actions or management to prevent future violations.

Buckingham failed to heed the Forest Service's warnings. The Forest Service confirmed that Buckingham's cattle were still grazing in unauthorized areas of the Buttermilk Allotment, including the Buttermilk Meadows Unit, on September 14, 18, 19, 20, 22, 26, 28, 29, and November 10, 2005. Consequently, on November 18, 2005, the Forest Service issued a decision cancelling Buckingham's grazing permit in its entirety. In addition to listing Buckingham's recent permit violations, the letter recounted his long history of non-compliance, noting that from 1998 to 2005, the Forest Service

had issued him ten non-compliance letters, three suspensions, and two partial cancellations. The District Ranger concluded his letter as follows: "Due to repeated non-compliance with the terms and conditions of your term grazing permit, it is my decision to cancel the entire Buttermilk C & H term grazing permit of 824 cow/calf pairs."

The Forest Supervisor and the Regional Forester affirmed the District Ranger's decision. The Regional Forester's decision constituted a final agency action. 36 C.F.R. § 251.87(e)(3).

Buckingham promptly filed an action in the U.S. District Court for the District of Nevada seeking judicial review of the Forest Service's actions. Ultimately, the parties filed cross-motions for summary judgment. The district court ruled in favor of the Forest Service, holding, *inter alia*, that: (1) Buckingham failed to exhaust his administrative remedies as to his claim that the 2005 permit was unenforceable for its failure to contain proper maps and boundary descriptions; (2) the agency did not violate Buckingham's procedural due process rights by failing to provide him with a pre- or post-deprivation hearing; (3) the agency complied with the requirements of 5 U.S.C. § 558(c) before cancelling Buckingham's permit; and (4) the agency's consideration of Buckingham's history of non-compliance in its November 2005 cancellation decision was not arbitrary or capricious.

## STANDARD OF REVIEW

We review de novo the district court's summary judgment decision upholding the agency decision. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). Under the APA, a court may set aside an agency action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In doing so, the court's scope of review "is narrow and a court is not to substitute its

judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted). The review of whether an agency's action "was arbitrary or capricious is highly deferential, presuming the agency action to be valid." *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002) (internal quotation marks omitted).

We review de novo questions of law, including due process claims. *Mohammed v. Gonzales*, 400 F.3d 785, 791-92 (9th Cir. 2005).

## DISCUSSION

### I.  Exhaustion of Administrative Remedies

Buckingham argues that the Forest Service's cancellation decision was arbitrary and capricious because neither the 2005 permit nor the 2005 AOIs included a description or map defining the location and boundaries of the Buttermilk Allotment's pastures where he had grazing and maintenance obligations. The district court declined to reach the merits of Buckingham's argument, holding that he had failed to exhaust his administrative remedies on this claim. We affirm the district court's decision that Buckingham failed to exhaust his administrative remedies by failing to properly raise this issue before the Forest Service.

**[1]** The APA requires plaintiffs to exhaust their administrative remedies before bringing suit in federal court. 5 U.S.C. § 704.

> The purpose of the exhaustion doctrine is to allow the administrative agency in question to exercise its expertise over the subject matter and to permit the agency an opportunity to correct any mistakes that may have occurred during the proceeding, thus avoiding unnecessary or premature judicial intervention into the administrative process.

*United Farm Workers v. Ariz. Agric. Employment Relations Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1982). The exhaustion requirement applies to claims brought before the Forest Service. 7 U.S.C. § 6912(e).

There is no bright-line test to determine whether a party has properly exhausted a claim to the Forest Service; the determination must be made on a case-by-case basis. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). Although "claimants who bring administrative appeals may try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than using precise legal formulations," claimants are still obligated to raise their problem "with *sufficient clarity* to allow the decision maker to understand and rule on the issue raised." *Id.* (emphasis added).

Buckingham contends that the district court erred by relying only upon *Idaho Sporting Congress* in its exhaustion ruling. He asserts that the district court failed to account for our decision in *Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002), which he asserts "refined and explained" the standard set out in *Idaho Sporting Congress*. Contrary to Buckingham's position, *Native Ecosystems Council* and *Idaho Sporting Congress*, which were handed down by the same panel on the same day, did not rely upon divergent exhaustion standards or doctrines. Any variation in the outcome of the exhaustion issues involved in those two decisions turned on the facts unique to those cases, not different legal standards.

**[2]** In *Native Ecosystems Council*, we observed that "claims raised at the administrative appeal and in the federal complaint *must be so similar* that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, *the same claims* now raised in federal court." 304 F.3d at 899 (emphasis added) (internal quotation marks omitted). The record shows that Buckingham argued to the Forest Service that other ranchers' non-compliance with their permit obligations precluded Buckingham from complying with his own grazing and maintenance obligations. But that argument is not "so similar" to Buckingham's current argument, which turns solely on his permit's language rather than his neighboring ranchers' conduct, that the Forest Service would consider those two arguments to be "the same claim." Buckingham has otherwise failed to direct our attention to any place in the administrative record where he articulated a specific argument related to the permit's allegedly vague or deficient description of pasture boundaries.

**[3]** Therefore, this is not a case where Buckingham has framed his case "in non-legal terms rather than precise legal formulations." *Id.* at 900. Rather, Buckingham simply failed to address this argument to the Forest Service "with sufficient clarity to allow the [agency] to understand and rule on the issue raised." *Idaho Sporting Congress,* 305 F.3d at 965. Accordingly, the district court did not err in holding that Buckingham failed to exhaust this argument to the Forest Service.

## II.   Procedural Due Process

**[4]** Buckingham next contends that the Forest Service violated his Fifth Amendment right to procedural due process. The Due Process Clause of the Fifth Amendment forbids the federal government from depriving persons of "life, liberty, or property, without due process of law." U.S. Const. amend. V. To be entitled to procedural due process, a party must show a liberty or property interest in the benefit for which protec-

tion is sought. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). If the party establishes that such an interest exists, a court determines what process was due and whether the party was actually afforded such process. *Id.* at 481-82.

Here, the district court held that Buckingham had a protected property interest in the duration of his 2005 grazing permit. The Forest Service contests this position in a letter to the court dated March 12, 2010, arguing that "no such property right exists." Because we hold that the Forest Service complied with the requirements of due process, whether or not Buckingham possessed a protected property interest in his grazing permit, we do not reach the question of the exact nature of that property interest here.

To determine whether the Forest Service's administrative procedures leading up to the termination of Buckingham's grazing permit afforded him due process, we must balance: (1) the private interest that will be affected by the action, (2) the risk of an erroneous deprivation of that interest through the procedures used and the value of additional or alternative safeguards, and (3) the government's interest, including the additional costs and administrative burdens that additional procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

**[5]** Whatever the exact nature of Buckingham's property interest in the disputed grazing permit, it is clear that Buckingham's livelihood depends, at least in part, upon the right to graze his livestock on national forest lands. The government also has a strong interest in managing livestock permitted to graze in the national forests in order to preserve that valuable land and its resources. Cattle control is a vital aspect of protecting that governmental interest. As stated by the Forest Supervisor in his decision affirming the District Ranger's June 2004 decision,

> Control of cattle is the most important responsibility of any permittee. All grazing systems and resource

management plans and requirements are based on the assumption that a certain permitted number of cattle are located in a certain grazing unit for a particular period of time. This is particularly true in rest units. The resource benefits of a seasons [sic] rest are essentially eliminated by unauthorized grazing.

With the substantial interests of both parties in mind, we next consider "the fairness and reliability of the existing . . . procedures, and the probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 343. In doing so, we look to the process given Buckingham in this case, as well as the process generally given someone whose grazing permit is cancelled, and evaluate the likelihood of the Forest Service making a mistake. *See Humphries v. County of Los Angeles*, 554 F.3d 1170, 1194 (9th Cir. 2009); *Mathews*, 424 U.S. at 344 ("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."). Buckingham argues that the pre- and post-deprivation procedures afforded him by the Forest Service were insufficient. He contends that "[a]n evidentiary hearing, or at minimum, the chance to confront or cross examine witnesses, would have helped assess the[ ] many 'comparative faults' and their relationship on the allotment and their impact upon Buckingham's ability (or lack thereof) to comply."

**[6]** We are not persuaded. "The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Nevertheless, procedural due process does not require that the notice and opportunity to be heard occur before the deprivation. *Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). It can take place through a combination of pre- and post-

deprivation procedures, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547-48 (1985), or be satisfied with post-deprivation process alone, *Brewster*, 149 F.3d at 984. Further, "[d]ue process does not always require an adversarial hearing," *Hickey v. Morris*, 722 F.2d 543, 549 (9th Cir. 1984), a full evidentiary hearing, *United States v. Clifford Matley Family Trust*, 354 F.3d 1154, 1162 (9th Cir. 2004), or a formal hearing, *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978) ("The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a 'due process hearing' in appropriate circumstances."); *see also id.* ("'[A] hearing in its very essence, demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal.' " (quoting *Londoner v. Denver*, 210 U.S. 373, 386 (1908))); *Brewster*, 149 F.3d at 985 ("The hearing need not even approximate a trial-like proceeding; in fact, it may be 'very limited' and still pass constitutional muster." (quoting *Gilbert v. Homar*, 520 U.S. 924, 929 (1997))). Nor is the opportunity to cross-examine witnesses mandatory in all cases. *See Brock v. Roadway Express, Inc.*, 481 U.S. 252, 266 (1987) ("We conclude, however, that as a general rule the employer's interest is adequately protected without the right of confrontation and cross-examination, again so long as the employer is otherwise provided an opportunity to respond at a meaningful time and in a meaningful manner." (internal quotation marks omitted)). At bottom, the due process evaluation " 'is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews*, 424 U.S. at 334 (quoting *Morrissey*, 408 U.S. at 481).

**[7]** Before the Forest Service finally cancelled his grazing permit, it provided Buckingham with ample procedures, pre- and post-deprivation, to ensure that he could present his side of the story. Prior to the November 2005 cancellation decision, the Forest Service notified Buckingham in writing of his permit violations on several occasions. It issued notices of

non-compliance to him on July 25, August 18, and September 9, 2005. Each of those notices informed Buckingham of the basis for the alleged non-compliance, and specified the dates on which Forest Service personnel had observed his livestock in an unauthorized pasture, the name of the pasture, and how many livestock were seen. In addition, those notices provided Buckingham with the name and contact information of the Forest Service agent to contact if he had any questions or concerns about the letters. Moreover, Buckingham engaged in conversations with Forest Service personnel during the 2005 grazing season to discuss compliance issues. Thus, months before the Forest Service terminated his permit, the Forest Service gave Buckingham timely notice of the charges against him, as well as the evidence supporting those charges, and afforded Buckingham the opportunity to address his concerns or disagreement with the charges directly to Forest Service personnel.

In addition, following the cancellation, the Forest Service provided Buckingham with two levels of administrative review of its decision. Buckingham was entitled to appeal, and did appeal, to the Forest Supervisor in accordance with 36 C.F.R. § 251.87(c)(1) and then to the Regional Forester in accordance with 36 C.F.R. § 251.87(c)(2). In both cases, he was entitled to present "narrative evidence and argument," and a written reply to the agency's response. *See id.* §§ 251.90(a), 251.94(c). Buckingham was also entitled to present oral argument at the first-level appeal. *See id.* § 251.97.

**[8]** Buckingham argues that procedures such as an evidentiary hearing and cross-examination were necessary here because of the many disputed facts involved in his case. Nevertheless, Buckingham has failed to persuasively explain why he was unable to resolve those factual issues through the ample process he was given. The record shows that Buckingham, over the course of many years, was able to raise, and did raise, the same factual disputes before the Forest Service that

he raises now on appeal. The Forest Service considered whether those matters excused Buckingham's serial non-compliance, and concluded they did not. For example, in the Forest Supervisor's April 2005 decision upholding the District Ranger's partial cancellation decision, the Forest Supervisor acknowledged Buckingham's proffered explanations for his non-compliance (e.g., gates being left open, neighboring permittees causing the misplacement of his cattle), and determined these explanations lacked credibility.

The Forest Supervisor further noted that "similar issues had occurred repeatedly over nearly 30 years" and "found the record to be remarkable in the number of letters about this issue since 1986." In the appeal of the November 18, 2005, decision, both the Forest Supervisor and Regional Forester addressed each of Buckingham's excuses. For example, as to Buckingham's explanation that a neighboring permittee failed to maintain her portion of the fence, which allegedly permitted his cattle to drift into the unauthorized pasture, the Regional Forester noted that the neighboring permittee had repaired that fence but that Buckingham's non-compliance persisted. Therefore, it is apparent from the record that Buckingham had the opportunity to present, and did present, his case as to why he was unable to comply with the permit terms, that the adjudicator was able to consider, and did consider, the evidence presented by both Buckingham and the Forest Service, resulting in the adjudicator making an informed decision.

[9] In sum, by the time the administrative appeal process concluded, the Forest Service had given Buckingham sufficient pre- and post-deprivation procedures to satisfy any due process concerns. Prior to the cancellation of his permit, the Forest Service personnel notified Buckingham of the charges against him, gave him ample opportunity to respond, and participated in telephone and face-to-face conversations with Buckingham. After the Forest Service cancelled his permit, Buckingham, represented at all times by counsel, was permit-

ted to give oral argument at his first level of administrative appeal, and was permitted to present written arguments and evidence on his own behalf at both the first and second level of administrative appeal. Viewing all the opportunities given Buckingham, we cannot conclude that the Forest Service deprived him of the opportunity to be heard at a meaningful time and in a meaningful manner. *Brewster*, 149 F.3d at 984; *see also Clouser v. Espy*, 42 F.3d 1522, 1540-41 (9th Cir. 1994) (holding due process did not require the Forest Service to conduct an evidentiary hearing, at either the initial decision stage or at the administrative appeal stage, in connection with refusing miners' motorized access to their mining claims located on national forest land).[1]

### III.    Notice Requirements under the APA

Buckingham also argues that the Forest Service failed to give him notice and an opportunity to demonstrate or achieve compliance with his permit, in accordance with the APA, 5 U.S.C. § 558(c). Section 558(c) provides:

> Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given-

---

[1]Buckingham cites 43 C.F.R. §§ 4160.4 and § 4.470 for the proposition that the Bureau of Land Management (BLM) furnishes the exact type of evidentiary hearings in connection with grazing permit decisions that Buckingham contends the Forest Service should have provided him. Those regulations, however, provide for no such hearing. They merely provide that a permittee who is adversely affected by a final BLM grazing decision may appeal the decision to an administrative law judge, *id*. § 4.470(a), and state that in the event that the Office of Hearings and Appeals stays all or part of a grazing decision that cancels or suspends a permit, the BLM will continue to authorize grazing under the permit that was in effect immediately before its decision until the appeal is resolved, *id*. § 4160.4.

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c).

The parties agree that Buckingham's grazing permit qualifies as a license for purposes of § 558(c). The dispute here is whether the Forest Service complied with § 558(c) by giving Buckingham adequate notice and adequate opportunities to comply with his permit.

**[10]** "Congress enacted . . . [§ 558(c)] to afford licensees an opportunity to comply with the requirements of a license before termination." *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1438 (9th Cir. 1991) (internal quotation marks omitted) (alteration in original). "This policy suggests that the key consideration is whether the written notice of a regulation's requirements is sufficient to allow the licensee an opportunity to comply with the regulation." *Id.* "Both the policies underlying section 558(c) and Ninth Circuit authority suggest that notice is sufficient if the notice warns the licensee of the parameters of acceptable conduct and thereby prevents unfair surprise." *Id.* The Forest Service cancelled Buckingham's "license" on November 18, 2005. Thus, the question is whether the Forest Service gave Buckingham sufficient notice, prior to that date, of his "transgressions" and an adequate opportunity to correct them. *See id.* at 1437.

**[11]** Before November 18, the Forest Service sent Buckingham three letters of non-compliance: one on July 25, one on August 18, and one on September 9. All three letters pinpointed the section of the disputed grazing permit that he violated and notified him of the factual basis for the charged violations. Thus, the Forest Service warned Buckingham of his transgressions three times before cancelling his permit.

Buckingham had ample time to correct the violations; moving his livestock from the wrong unit could have been easily remedied in a matter of days, or less.

Contrary to Buckingham's contention, his situation is not analogous to that at issue in *Anchustegui v. Department of Agriculture*, 257 F.3d 1124 (9th Cir. 2001). In *Anchustegui*, the agency issued a letter to the permittee, which recited a number of permit violations by the permittee, and proposed a 100-percent cancellation of the permit unless the permitee could show cause why the cancellation was unwarranted. *Id.* at 1126-27. In that case, the Forest Service issued *a single letter* to serve as both a notice of non-compliance and a decision letter regarding the same non-compliance. Under such circumstances, the agency did not give the permittee a fair opportunity to show that he had complied with the terms of his grazing permit. *Id.* at 1129.

Here, the July 25, 2005, letter did not announce any decision by the Forest Service. It merely informed Buckingham that his livestock were discovered grazing in a restricted pasture and instructed him that he needed to comply with his permit. After Buckingham failed to comply with the instructions in the July 25 letter, the Forest Service next issued its August 18, 2005, letter, notifying him of its decision to suspend 25 percent of his authorized use. Buckingham contends that the August 18 letter gave him no opportunity to correct his permit violations. To the contrary, the Forest Service provided that notice and opportunity with its July 25 letter, which expressly required Buckingham to remove all his livestock from the unauthorized pastures by July 27, 2005. On August 12 and 13, 2005, the Forest Service documented Buckingham's livestock still grazing in unauthorized pastures. Thus, the Forest Service predicated its August decision upon Buckingham's failure to do what it instructed him to do on July 25, 2005.[2]

---

[2]When the Forest Service issued its November 18, 2005, decision, that cancellation decision mooted the August 18, 2005, suspension.

Buckingham prefers to characterize the August 12 and 13 violations as new violations that renewed the Forest Service's obligations under § 558(c), requiring the Forest Service to give Buckingham a new opportunity to achieve compliance with those specific violations. Buckingham's position overlooks the background against which the August 12 and 13 violations transpired, namely the violations documented on July 23. Those August 12 and 13 violations were not committed by a permittee who had never dealt with the Forest Service. Because of Buckingham's prior violations in July, the August 12 and 13 violations served as evidence of Buckingham's failure to comply with the same terms of his permit for which he was cited in the July 25 letter.

If Buckingham's approach were adopted, it is difficult to see how the Forest Service, after documenting one permit violation, would ever be able to actually render an adverse decision related to a grazing permit, because each new violation would restart the clock for the permittee to comply. The purpose of § 558(c) is to give permittees a "second chance," not a third, fourth, and fifth chance. *Air N. Am.*, 937 F.2d at 1438. Buckingham would have permittees and the Forest Service engage in a bottomless vortex of red tape, consisting of "Forest Service issuance of [notice of non-compliance], permittee corrective action, Forest Service verification, followed by another violation of the same term or condition by the permittee, and so forth." Forest Service Handbook 2209.13, Grazing Permit Administration Handbook, Intermountain Region (Region 4) [hereinafter FSH 2209.13], Section 16.36 (2009), *available at* http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?2209.13 (follow "id_2209.13-2009-1doc" hyperlink) (last visited Apr. 19, 2010) ("While [permittees] may be entitled to a 'second chance,' permittees are not entitled to unlimited chances to correct repeated incidents of noncompliance regarding the same or a closely related permit terms or conditions.").

[12] Buckingham presents the identical argument in attacking the November 18, 2005, letter. He argues it served as a

notice of non-compliance and a decision letter, like the letter in *Anchustegui*. Although the letter cited a number of new violations taking place in September 2005, those violations served as evidence, once again, of Buckingham's failure to keep his livestock out of unauthorized pastures, such as the Buttermilk Meadows Unit. These new violations did not relate to entirely new terms of his permit, but were based upon previous violations of which the Forest Service had notified him repeatedly since July 2005. *Cf.* FSH 2209.13, Section 16.36 ("[I]f the permittee violates a different term and condition than the one referenced in the first Notice, the authorized officer should issue another Notice to address this new violation."). In sum, we conclude that the July 25 letter provided Buckingham with an opportunity to achieve compliance or to demonstrate that he had achieved compliance before the Forest Service instituted agency proceedings against him with its subsequent permit suspension and cancellation decisions.

## IV.   Prior Violations

In its November 18, 2005, cancellation decision, the Forest Service recounted Buckingham's history of non-compliance with his grazing permits, occurring between 1998 and 2004, in addition to his 2005 violations. Buckingham argues that the Forest Service acted arbitrarily and capriciously by considering any violations that occurred before his 2005 grazing permit issued. According to Buckingham, "[i]ssues of compliance within any *preceding* permit period cannot form the basis for non-compliance under the current permit."

**[13]** Since at least as early as 1897, when Congress enacted the Forest Service Organic Administration Act, the Forest Service has been charged with preserving our nation's priceless woodlands from destruction. *See* 16 U.S.C. § 551. To that end, the Forest Service has "broad authority" to issue grazing permits. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003) (citing 36 C.F.R. § 222.3). It

also has broad authority to cancel or suspend a grazing permit if a permittee does not comply with the provisions and requirements of that permit or governing regulations. *See* 36 C.F.R. § 222.4(a)(4). That authority was spelled out for Buckingham in the very language of the 2005 grazing permit he signed.

**[14]** For years, the Forest Service exercised exceptional restraint in dealing with Buckingham. After his repeated failures to comply with the terms of his grazing permit, despite numerous warnings and sanctions, the Forest Service determined that "enough was enough" and that complete termination of his grazing rights was appropriate. The Forest Service recognizes that permit cancellations are serious sanctions. As a result, it "[a]pproach[es] permit cancellation with discretion." Forest Service Handbook 2209.13, Grazing Permit Administration Handbook [hereinafter FSH 2209.13 (1992)], Section 16.2 (1992), *available at* http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?2209.13 (follow "2209.13,16-19.rtf" hyperlink) (last visited Apr. 19, 2010). But its directives acknowledge that prior offenses may be relevant to a cancellation determination. *See id.* ("Total cancellation is seldom justified in *first offense* cases unless violation is flagrant and willful." (emphasis added)). Cancellation for an isolated offense would be inappropriate in most cases because "[n]oncompliance with the term grazing permit terms and conditions are generally cumulative." FSH 2209.13, Section 16.4. As a result, "any and all recent prior occurrences of noncompliance with permit terms and conditions should be considered in determining" repeat offenses, including offenses from previous grazing seasons. *Id.* Although some of Buckingham's cited violations stretched back to 1998, these were not isolated events, but the beginning of a lengthy history of substantially identical violations, which were still occurring in the 2005 grazing season. Buckingham was no first-time offender. As a result, the Forest Service possessed the authority to deem complete cancellation to be the appropriate sanction, and its ultimate decision to do so was not arbitrary or

capricious. *See* 36 C.F.R. § 222.4(a)(4) ("The Chief, Forest Service, is authorized to cancel, modify, or suspend grazing and livestock use permits *in whole* or in part . . . if the permittee does not comply with provisions and requirements in the grazing permit or the regulations of the Secretary of Agriculture on which the permit is based.") (emphasis added); FSH 2209.13 (1992), Section 16.23 ("Suspension or cancellation is warranted if permittee livestock graze . . . on lands outside the permitted area[.]").

Buckingham responds with a citation to 36 C.F.R. § 222.3. That regulation states in relevant part: "A term permit holder has first priority for receipt of a new permit at the end of the term period provided he has fully complied with the terms and conditions of the expiring permit." *Id.* § 222.3(c)(1)(ii). He construes this regulation to mean that when the Forest Service issued him his grazing permit in May 2005, it necessarily determined that Buckingham had "fully complied" with the terms of his previous permits, mooting any past violations he may have had under those prior permits.

**[15]** Buckingham's response is creative but unpersuasive. In May 2005, the Forest Service did not issue him a "new permit." Rather, it issued him a revised permit, valid for the remaining three years of the ten-year term of his 1999 permit,[3] reflecting the reduced usage he was entitled to as a result of his failure to comply with the terms of his 1999 permit. Further, the Forest Service obviously did not issue him his 2005 permit based upon a decision that he had fully complied with the terms of his prior permit; the 2005 permit was issued because Buckingham had violated the terms of the 1999 permit. Buckingham cannot reasonably argue that the Forest Service's issuance of the 2005 permit was a tacit approval of his compliance with his 1999 permit.

---

[3]The 1999 permit and the 2005 permit both expired on December, 31, 2008.

Moreover, Buckingham concedes that the Forest Service could consider his violations of the 2005 permit in deciding to suspend or cancel his 2005 permit. Buckingham's repeated violations of the 2005 permit alone were serious. His 2005 permit was issued in May 2005. As soon as July 2005, the Forest Service had to send him another notice of non-compliance for having 42 head of livestock in the Buttermilk Meadows Unit. Forest Service personnel later observed Buckingham's livestock in unauthorized pastures on August 12, 13, 23, and 25, triggering the notices that issued on August 18 and September 9, 2005. Then, Forest Service personnel reported Buckingham's livestock in unauthorized pastures on September 14, 18, 19, 20, 22, 26, 28, and 29. Based on the violations occurring in the 2005 grazing season alone, the Forest Service had a reasonable basis for cancelling Buckingham's 2005 permit.

## CONCLUSION

We hold that the Forest Service did not act arbitrarily or capriciously in deciding to cancel Buckingham's grazing permit, and that in doing so, it provided Buckingham the procedures he was due under both the Fifth Amendment and the APA.

**AFFIRMED**.