**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

2-BAR RANCH LIMITED
PARTNERSHIP, a Montana limited
partnership; BROKEN CIRCLE RANCH
COMPANY, INC., a Montana profit
corporation; R BAR N RANCH, LLC,
a Montana limited liability
corporation,

  *Plaintiffs-Appellees*,

v.

UNITED STATES FOREST SERVICE, an
Agency of the United States
Department of Agriculture; THOMAS
J. VILSACK, in his official capacity as
Secretary of the United States
Department of Agriculture;
VICTORIA CHRISTIANSEN, in her
official capacity as Chief of the
United States Forest Service;
LEANNE MARTEN; CHERI FORD, in
her official capacity as Forest
Supervisor for the Beaverhead-
Deerlodge National Forest;
CAMERON RASOR, in his official
capacity as District Ranger for the
Pintler Ranger District in the
Beaverhead-Deerlodge National
Forest,

  *Defendants-Appellants*.

No. 19-35351

D.C. No.
2:18-cv-00033-
SHE

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted June 4, 2020
Portland, Oregon

Filed May 6, 2021

Before:  Marsha S. Berzon and Daniel P. Collins, Circuit
Judges, and Jennifer Choe-Groves,[*] Judge.

Opinion by Judge Berzon

---

## SUMMARY[**]

### Grazing Permits / Equal Access to Justice Act

The panel reversed the district court's partial grant of summary judgment to Plaintiff cattle ranchers in their action challenging the U.S. Forest Service's decision to apply 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment in the Beaverhead-Deerlodge National Forest, where plaintiffs had grazing permits for their cattle; held that Plaintiffs were not entitled to attorneys' fees under the Equal Access to Justice Act ("EAJA") for their administrative

---

[*] The Honorable Jennifer Choe-Groves, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

appeal; and remanded with instructions to grant summary judgment to the Service.

In 1995, the Service amended some forest plans, including the 1987 Deerlodge Forest Plan. To implement the Plan's new grazing standard, the Service developed a set of mitigation measures (the "1995 Riparian Mitigation Measures") that applied to specific allotments, including the Dry Cottonwood Allotment. In 2009, the Service replaced the 1987 Deerlodge Forest Plan with the 2009 Forest Plan, and continued to apply the 1995 Riparian Mitigation Measures. The district court held that the Service's application of the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment was arbitrary and capricious and violated the National Forest Management Act.

The panel held that the plain language of the 2009 Forest Plan supported the Service's application of the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment, and to Plaintiffs' grazing permits. The Service's incorporation of the 1995 measures into Plaintiffs' grazing permits was therefore lawful. Because the 2009 Forest Plan was not ambiguous in any pertinent respect, the panel did not reach the Service's alternative argument that the panel should defer to its regulatory interpretation.

EAJA provides that an agency that conducts an adversary adjudication shall award to a prevailing party fees and other expenses incurred in connection with that proceeding. An agency proceeding is an "adversary adjudication" for EAJA purposes only if it is actually governed by the Administrative Procedures Act ("APA")'s formal adjudication requirements, as opposed to similar requirements of another statute or regulation. 5 U.S.C. § 554 delineates the scope of proceedings governed by the formal

adjudication requirements of the APA.  The panel held that the Service's administrative appeal process was not governed by Section 554.  The panel held further that the administrative appeal here was not an "adversary adjudication" for purposes of EAJA. The panel concluded that the Service properly denied Plaintiffs' request for attorneys' fees for their administrative appeal.

**COUNSEL**

Erika B. Kranz (argued) and David Gunter, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Steven Vaden, General Counsel; Elise Foster, Attorney; United States Department of Agriculture, Washington, D.C.; for Defendants-Appellants.

Calli J. Michaels (argued) and John E. Bloomquist, Bloomquist Law Firm P.C., Dillon, Montana, for Plaintiffs-Appellees.

Abigail J. St. Lawrence, Abigail St. Lawrence Law Firm P.C., Helena, Montana, for Amici Curiae Rocky Mountain Stockgrowers Association and Public Lands Council.

**OPINION**

BERZON, Circuit Judge:

The U.S. Forest Service and other federal defendants (collectively, "the Service") appeal the judgment entered by the district court after the court's grant of partial summary judgment to the plaintiff cattle ranchers (collectively, "Plaintiffs"). We conclude that the Service lawfully applied a particular set of standards for protecting stream habitats from the effects of cattle grazing, the 1995 Riparian Mitigation Measures, to Plaintiffs' grazing permits. Additionally, Plaintiffs were not entitled to attorney's fees under the Equal Access to Justice Act for their administrative appeal. We therefore reverse the district court's grant of partial summary judgment to Plaintiffs and remand with instructions to grant summary judgment to the Service.

**BACKGROUND**

**I.**

Plaintiffs 2-Bar Ranch Limited Partnership, R Bar N Ranch, LLC, and Broken Circle Ranch Company, Inc. hold or held permits to graze cattle on the Dry Cottonwood Allotment, which is part of the Beaverhead-Deerlodge National Forest in Montana.[1] The U.S. Forest Service manages the forest under the multiple-use, sustained-yield mandate prescribed by the National Forest Management Act ("NFMA"), which requires the Service to balance uses

---

[1] Broken Circle Ranch no longer holds a permit but asserts an interest in the appeal to the extent it affects its entitlement to attorney's fees from the administrative proceeding.

including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

"NFMA envisions a two-stage approach to forest planning." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996). At the first stage, the Service develops a forest plan, along with an environmental impact statement as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. Forest plans are broad, programmatic documents that "guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape." 36 C.F.R. § 219.1(b). "Direct implementation of the [forest plan] occurs at a second stage, when individual site-specific projects are proposed and assessed." *Inland Empire*, 88 F.3d at 757 (alteration and citation omitted). "These site-specific projects must be consistent with" the forest plan. *Id.*

The Service also takes a multistage approach to implementing its grazing program. When it decides to allow grazing in a particular area of a national forest, it develops an allotment management plan for that area. *See* 43 U.S.C. § 1752(d); 36 C.F.R. § 222.2(b). An allotment management plan "prescribes the manner in, and extent to, which livestock operations will be conducted . . . to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands" involved. 43 U.S.C. § 1702(k)(1); 36 C.F.R. § 222.1(b)(2).

The Service authorizes grazing on an allotment by issuing individual grazing permits to ranchers. *See* 43 U.S.C. § 1752(a). Permits, which typically last for ten years, specify the terms and conditions of the grazing allowed. *Id.*; *see* 36 C.F.R. § 222.3(c). The Service may adjust the amount of grazing allowed each year by issuing annual operating instructions. *See* Forest Service Handbook 2209.13, § 94.3.

"Whereas the [allotment management plan] relates the directives of the applicable forest plan to the individual grazing allotment, and the grazing permit sets grazing parameters through a ten-year period, the [annual operating instructions] annually convey[] these more long-term directives into instructions to the permittee for annual operations." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006).

## II.

Between 1987 and 2009, all permits for grazing on the Dry Cottonwood Allotment were governed by the 1987 Deerlodge Forest Plan. In 2009, the Service issued a new forest plan for the combined Beaverhead-Deerlodge National Forest (the "2009 Forest Plan"). The 2009 Forest Plan, discussed further below, remains in effect today.

The 1987 Deerlodge Forest Plan set "allowable use levels" for livestock grazing of riparian vegetation. Depending on the condition of the vegetation in a particular area and the type of grazing contemplated, the plan limited the percentage of riparian shrubs, bluegrass, and sedge that livestock could consume.

In 1995, the Service amended some forest plans, including the 1987 Deerlodge Forest Plan, by adopting a new approach, the Inland Native Fish Strategy, to managing habitat for inland native fish. The amendment added a new grazing standard to the forest plan, directing the Service to "[m]odify grazing practices . . . that retard or prevent attainment" of certain riparian management objectives. The objectives related to stream characteristics such as water temperature and bank stability.

The 1995 amendment did not alter the 1987 Forest Plan's existing allowable use levels for livestock grazing of riparian vegetation. But to implement the plan's new grazing standard, the Service developed a set of mitigation measures (the "1995 Riparian Mitigation Measures") that could be applied to specific allotments. *See* Appendix. The 1995 Riparian Mitigation Measures "use four measurable parameters to determine the appropriate level of livestock grazing in riparian areas": "streambank disturbance," "stubble height," "woody browse use," and "riparian herbaceous utilization." The measures are presented in the form of a matrix prescribing different allowable use levels for each parameter, depending on the physical characteristics of a riparian area and the types of vegetation present. The Service did not incorporate the 1995 Riparian Mitigation Measures into the 1987 Forest Plan itself but instead applied them to designated allotments, on a case-by-case basis.

The Dry Cottonwood Allotment was one such allotment. In 1995, the Service prepared an environmental assessment under NEPA to determine whether to "change current grazing practices" on the Dry Cottonwood Allotment "by implementing riparian mitigation measures to maintain or move toward desired riparian conditions." In 1996, the Service issued a Record of Decision applying the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment. The Service also produced an allotment management plan specifying four areas that would be monitored for compliance with specific use levels set out in the Riparian Mitigation Measures.[2]

---

[2] There are two documents in the record titled "Dry Cottonwood Allotment Management Plan," both undated. The Service asserts that it approved one of these documents in 1996, upon completion of the NEPA

In 1997, the Service reissued the 1995 Riparian Mitigation Measures, with additional guidance about how to comply with them. The allowable use levels themselves were identical. In the 1997 version, the Service added several paragraphs of prefatory text, in a new section titled "Application," that explained how to "apply the mitigation measures." Among other propositions, the 1997 version states that compliance measurements must be conducted in areas that "represent[] the entire pasture" and cannot be "located in isolated areas that are heavily damaged if the remainder of the pasture is in better condition." The 1995 Riparian Mitigation Measures do not contain analogous language.[3]

---

process. Plaintiffs contend that no allotment management plan was ever implemented at all, but that contention is refuted by the fact that Plaintiffs later signed and accepted grazing permits that expressly incorporated by reference the Allotment Management Plan that was "approved" in 1996. Plaintiffs do not provide any basis in their brief for contesting the Forest Supervisor's conclusion as to *which* of the two versions of the Allotment Management Plan in the record is the one that was approved in 1996. As the Forest Supervisor found in her decision in this case, the Allotment Management Plan approved in 1996 "is consistent with the 1996 [Record of Decision concluding the NEPA process]" and "appropriately describes the 1996 decision . . . , including applicable resiliency/resistance level and vegetation type by stream."

[3] In a nuance not noted by the parties, the Service issued a separate version of the measures in 1997, titled "Riparian Use Criteria," that did not include the "Application" section. Again, the allowable use levels were identical to those in the 1995 Riparian Mitigation Measures. The Service appears to have used and referred to the two 1997 documents interchangeably. As the two documents and the 1995 Riparian Mitigation Measures all contain the same allowable use levels, which is what matters for present purposes, we do not distinguish in this opinion between the two 1997 documents. Instead, we refer to the "1997 version

Following the 1996 Record of Decision, the Service issued a series of ten-year permits authorizing Plaintiffs to graze their cattle on the Dry Cottonwood Allotment. The first permit, issued in 1996, incorporated and required compliance with the 1995 Riparian Mitigation Measures. All the subsequent permits incorporated and required compliance with both the 1996 allotment management plan and the 1997 version of the mitigation measures.

## III.

In 2009, the Service replaced the 1987 Deerlodge Forest Plan by issuing a new forest plan for the combined Beaverhead-Deerlodge National Forest. The 2009 Forest Plan included a livestock grazing standard, Grazing Standard 1, that prescribed new allowable use levels for livestock grazing. The new levels applied by default to "livestock grazing operations unless or until specific long-term objectives, prescriptions, or allowable use levels have been designed through individual resource management plans or site-specific NEPA decisions." For example, the new levels applied to "[a]ny allotment management plan lacking riparian management objectives and guides designed specifically for that allotment."

Although the allowable use levels in the 2009 Forest Plan are similar to the 1995 Riparian Mitigation Measures, they differ in key respects. The 2009 measures use two of the same parameters as the 1995 measures: streambank disturbance and riparian stubble height. But they omit the other two parameters contained in the 1995 measures: the limits on the percentage of woody browse and riparian

---

of the mitigation measures," a phrase that should be taken to refer to either or both of the 1997 documents, as the circumstances warrant.

herbaceous forage that livestock may consume in a grazing season. Conversely, the 2009 measures include three additional parameters not used in the 1995 measures: upland (non-riparian) range utilization, winter range, and riparian sites on streams that contain certain vulnerable fish species.

After adopting the 2009 Forest Plan, the Service continued to apply the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment, incorporating as before the 1996 allotment management plan and the 1997 version of the mitigation measures into Plaintiffs' grazing permits. Additionally, the Service issued annual operating instructions in 2015 and 2016 that reiterated the allowable use levels already incorporated in the permits.

## IV.

In 2015, the Service conducted range inspections on the Dry Cottonwood Allotment. In a year-end compliance report, the Service noted that the allowable use levels in the 2009 Forest Plan did not apply to the allotment because separate allowable use levels had been adopted in a site-specific NEPA decision, as reflected in the 1996 allotment management plan. The report concluded that "Forest Plan standards were met; however the North Fork had heavy use in areas and needs to be addressed."

The Service conducted range inspections on the allotment again in 2016. In November 2016, the Service sent a notice of noncompliance to the Plaintiffs, explaining that "riparian utilization and streambank disturbance standards were significantly exceeded at the Orofino Creek and Perkins Gulch sites." The notice included a table comparing the allowable use levels incorporated in the permits with the actual livestock use in 2016. "To provide for improved

resource conditions," the notice prescribed a single set of allowable use levels, applicable across the allotment.

Early in 2017, the Service issued annual operating instructions to Plaintiffs that included the allowable use levels prescribed in the 2016 notice of noncompliance. The Service issued a second notice of noncompliance in November 2017, finding that "one or more allowable use standards were exceeded." And in December 2017, after a meeting with Plaintiffs, the District Ranger issued a decision suspending 20 percent of Plaintiffs' grazing privileges for the 2018 and 2019 seasons on the Dry Cottonwood Allotment.

Plaintiffs filed an administrative appeal, and the Forest Supervisor reversed the suspension of grazing privileges. The Forest Supervisor confirmed that the 2009 Forest Plan's Grazing Standard 1 "does not apply to the Dry Cottonwood Allotment as that interim direction only applies to allotments without site-specific NEPA decisions. Site specific [allowable use levels] have been in place for the Dry Cottonwood Allotment since 1996." The Forest Supervisor clarified that the 1996 NEPA process "clearly selected" the allowable use levels described in the 1995 Riparian Mitigation Measures. She found that the Service's inclusion of the 1997 version of the mitigation measures in Plaintiffs' permits was therefore "unnecessary," and she directed the District Ranger to remove the 1997 version of the mitigation measures from the operative permits and replace it with the 1995 Riparian Mitigation Measures.

Plaintiffs sought to recover attorney's fees under the Equal Access to Justice Act ("EAJA") for the administrative appeal. The Forest Supervisor denied the fee request, concluding that, under Service regulations, 36 C.F.R. § 214.14(*i*), the parties to an administrative appeal bear their

own expenses. Plaintiffs sought further discretionary substantive review within the agency, which was denied, and also renewed their fee request. The Forest Supervisor again denied the request, explaining that "[a]n appeal of a ranger's decision to suspend a portion of the grazing permit is not an 'adjudication' under 5 U.S.C. [§] 554 to which EAJA applies."

## V.

Plaintiffs filed suit in federal district court, claiming that the Service's decision to apply the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment, instead of the allowable use levels in the 2009 Forest Plan, violated NFMA and the Administrative Procedure Act ("APA"). The district court granted in part Plaintiffs' motion for summary judgment, holding that the Service's application of the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment was arbitrary and capricious and violated NFMA.

The district court focused on the 2009 Forest Plan's statement that the allowable use levels prescribed in Grazing Standard 1 apply to "[a]ny allotment management plan lacking riparian management objectives and guides *designed specifically for* that allotment." (Emphasis added.) The court reasoned that the 1995 Riparian Mitigation Measures were specifically *applied to*, not designed for, the Dry Cottonwood Allotment. The court vacated the Forest Supervisor's finding that the 1995 Riparian Mitigation Measures apply to the Dry Cottonwood Allotment; the portions of the 2016 and 2017 notices of noncompliance finding Plaintiffs in violation of the 1995 or 1997 allowable use levels; the incorporation of the 1996 allotment management plan into Plaintiffs' grazing permits; and the Service's annual operating instructions to Plaintiffs in 2018, to the extent they incorporated the 1995 Riparian Mitigation

Measures. The court remanded the case to the Service to determine which allowable use levels apply to the Dry Cottonwood Allotment.

The district court declined to review the Forest Supervisor's determination that the administrative appeal was not an "adjudication" for purposes of EAJA, reasoning that it would be "premature" to reach that issue because the Forest Supervisor had not yet considered whether the Service's position was "substantially justified," as required if EAJA were applicable. 5 U.S.C. § 504(a)(1). The court directed the Service to address that question on remand.

The Service timely appealed. We review the grant of partial summary judgment de novo. *United States v. Washington*, 971 F.3d 856, 861 (9th Cir. 2020).

## DISCUSSION

### I.

### A.

The Service contends that the plain language of the 2009 Forest Plan supports the Service's application of the 1995 Riparian Mitigation Measures to the Dry Cottonwood Allotment. We agree.

Again, the allowable use levels prescribed in Grazing Standard 1 of the 2009 Forest Plan "apply to livestock grazing operations unless or until specific long-term objectives, prescriptions, or allowable use levels have been designed through individual resource management plans or site-specific NEPA decisions." The plan explains that the 2009 levels "apply to the following situations: Any allotment management plan lacking riparian management objectives

and guides designed specifically for that allotment," as well as two additional situations not relevant here.

The district court held that there were no objectives or guides "designed specifically for" the Dry Cottonwood Allotment, because the 1995 Riparian Mitigation Measures were applicable to other allotments as well. In so holding, the court relied on the phrase "designed specifically for" in isolation, and interpreted it to mean that each excluded allotment had to have a separate mitigation plan created for that allotment only; no use of a template or matrix applicable to certain, specifically chosen allotments was allowed. The phrase "designed specifically for" cannot have the exceedingly narrow meaning the district court attributed to it.

Of particular significance in interpretating the 2009 Forest Plan's exclusion for certain allotments is the sentence providing that the 2009 levels apply "unless . . . specific . . . allowable use levels have been designed through . . . site-specific NEPA decisions." This language amplifies what is meant by "designed specifically for," making clear that the reference includes "specific . . . allowable use levels . . . designed through . . . site-specific NEPA decisions."

Exactly that process occurred here: The Service made a site-specific NEPA decision in 1996 that applied only to the Dry Cottonwood Allotment. The purpose of that process was to "change current grazing practices by implementing [the 1995] riparian mitigation measures" on that allotment.

To reach its 1996 decision, the Service prepared a 33-page environmental assessment. The assessment explained that "[c]attle affect stream shape and function through two mechanisms: directly by bank trampling and indirectly by

removing streambank vegetation." The assessment, and the 1995 Riparian Mitigation Measures, addressed both issues.

The 1995 Mitigation Measures sought to reduce bank trampling by setting a percentage limitation on the amount of streambank disturbance allowed during each grazing season. Once the limit was reached, ranchers would be required to move their cattle to another area. The specific limit varied depending on whether a stream reach had low, medium, or high resiliency. The environmental assessment applying the measures to the Dry Cottonwood Allotment explained that "[t]he amount of bank disturbance allowed under the riparian mitigation measures is based on the ability of the soils to withstand and recover from disturbance." Because streams in the Dry Cottonwood Allotment "flow through granitic soils and are not very resilient[,] . . . the amount of allowable streambank disturbance is correspondingly low."

With respect to riparian vegetation, the assessment found that in some areas, "[b]rowse use" of "[s]hrubby riparian vegetation," such as "dogwood, alder, and willow," was "heavy, and vigor of the shrubs [was] low." In other areas, browse use was "moderate" and the condition of the browse species was "fair" or "fair to good." The 1995 Riparian Mitigation Measures addressed the health of riparian vegetation through three different parameters: "stubble height," "woody browse use," and "riparian herbaceous utilization." The first and third parameters applied to herbaceous vegetation, and the second applied to woody species such as "willow, aspen, [and] dogwood."

The Service concluded that allowing continued grazing on the Dry Cottonwood Allotment, while implementing the 1995 Riparian Mitigation Measures, would "result in an upward trend in riparian conditions." Consistent with its

decision, the Service adopted an allotment management plan for the Dry Cottonwood Allotment incorporating the 1995 Riparian Mitigation Measures and identifying particular areas to be monitored for compliance with the measures. The Measures themselves are variable, depending on the particular conditions occurring on the allotment to which the measures were applied,[4] and the allotment management plan explained which parameters in the Riparian Mitigation Measures would apply to various locations in the allotment. Given the nature of the Riparian Mitigation Measures and the careful application of the Measures during the allotment-specific 1996 NEPA process, we have no difficulty concluding that that process fits the 2009 Forest Plan's description of a situation in which "specific . . . allowable use levels have been designed through . . . site-specific NEPA decisions," and so were "designed specifically for" the Dry Cottonwood Allotment.

Consideration of the purpose of Grazing Standard 1 in the 2009 Forest Plan bolsters our conclusion. That purpose is "to prevent reduction of *existing* water quality or physical or biological functions of riparian-wetland areas from management activities." (Emphasis added.) As the Service points out, applying the 2009 allowable use levels to the Dry Cottonwood Allotment would in some respects be less environmentally protective than applying the 1995 measures. Notably, one concern discussed in the environmental assessment for the Dry Cottonwood Allotment was the health of woody riparian species such as willow and dogwood. Although the 1995 Riparian Mitigation Measures limit livestock use of woody forage, the 2009 measures do not. Additionally, the 2009 measures do not contain a percentage limitation on livestock use of

---

[4] *See* Appendix.

riparian herbaceous forage, while the 1995 measures do. Replacing more protective standards with less protective standards would be contrary to the 2009 Forest Plan's goal of preserving "existing" water quality and physical and biological functions.

## B.

Unlike the district court, Plaintiffs do not focus on the "designed specifically for" phrase in the 2009 Forest Plan. Instead, they rely on a different part of the 2009 Forest Plan, which states generally both that the standards in the 2009 plan apply "forestwide" and that "[i]f there are additional objectives and standards for specific areas [they] will be listed in the appropriate management area in Chapter 4." Plaintiffs then point to the section of chapter 4 dedicated to the East Deerlodge Management Area, which contains the Dry Cottonwood Allotment. That section identifies no objectives or standards in addition to the forestwide standards that apply to the East Deerlodge Management Area. Plaintiffs conclude that the Service must not have adopted site-specific allowable use levels for livestock grazing on the Dry Cottonwood Allotment, as no such levels are listed in the East Deerlodge Management Area section in chapter 4.

We are unpersuaded. There is no conflict between applying the 2009 Forest Plan's Grazing Standard 1 "forestwide" and applying different allowable use levels to particular allotments based on site-specific processes. The caveat that different levels may apply to some allotments is already built into Grazing Standard 1, which itself states that the measures it contains apply to "livestock grazing operations *unless or until* specific long-term objectives, prescriptions, or allowable use levels have been designed through individual resource management plans or site-

specific NEPA decisions." (Emphasis added.) Applying Grazing Standard 1 forestwide necessarily includes applying the "unless or until" limitation, part of the standard, forestwide.

Plaintiffs also contend that the purpose of the 2009 Forest Plan was to replace inconsistent management direction with uniformity. Plaintiffs point to discussions in the administrative record of "inconsistencies." The text of Grazing Standard 1 itself belies Plaintiffs' assertion that the Service's overriding goal for grazing management was uniformity, as that standard expressly allows for, and preserves, site-specific allowable use levels that diverge from the default levels.

Finally, Plaintiffs maintain that the Service expressly rejected the 1995 Riparian Mitigation Measures when it adopted the 2009 Forest Plan. They cite the Service's decision not to retain the standards from the "Deerlodge Forest Plan Including INFISH-1995 Amendment." But as we have explained, the 1995 Riparian Mitigation Measures were never incorporated into the 1987 Deerlodge Forest Plan and were not part of the 1995 amendment to that plan. *See supra* p. 7–8. Instead, the Service created the Mitigation Measures as a standalone tool to help implement the amended forest plan. Moreover, Plaintiffs' insinuation that any application of the 1995 Riparian Mitigation Measures would inadequately protect riparian area function overlooks the fact that the application of the 1995 measures to the Dry Cottonwood Allotment is in some respects *more* environmentally protective than the 2009 default levels. *See supra* pp. 17–18.

Given the language and structure of the 2009 Forest Plan and the reticulated nature of the 1995 Riparian Mitigation Measures, the Service properly applied the Measures to the

Dry Cottonwood Allotment. The Service's incorporation of the 1995 measures into Plaintiffs' grazing permits was therefore lawful. Because the 2009 Forest Plan is not ambiguous in any pertinent respect, we need not reach the Service's alternative argument that we should defer to its regulatory interpretation.

## II.

The Forest Supervisor denied Plaintiffs' request for attorney's fees under EAJA for their administrative appeal, holding that their appeal was not an "adversary adjudication" for purposes of the fee-shifting statute. EAJA provides that

> [a]n agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust.

5 U.S.C. § 504(a)(1). The district court declined to review the Forest Supervisor's determination and instead remanded for the agency to consider whether the Service's position was "substantially justified." That approach was inappropriate, as the "substantially justified" standard would have no application were fees unavailable at all for the administrative appeal, as the Forest Supervisor held. On appeal, both sides ask us to decide whether the administrative appeal was an "adversary adjudication" rather than remanding the issue, noting that if it was not, proceedings on Plaintiffs' EAJA application will end. We agree that addressing the question is the more efficient course and do so.

EAJA defines an "adversary adjudication" as "an adjudication under section 554 of this title in which the position of the United States is represented by counsel or otherwise." 5 U.S.C. § 504(b)(1)(C). Section 554 "delineates the scope of proceedings governed by the formal adjudication requirements" of the APA, *Ardestani v. INS*, 502 U.S. 129, 132–33 (1991), and "applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing," with some exceptions not relevant here. 5 U.S.C. § 554(a). Section 554 also prescribes some of the requirements for formal adjudications under the APA; sections 556 and 557 prescribe additional ones. *Id.* §§ 556, 557. Among other things, parties are "entitled to present [their] case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." *Id.* § 556(d).

The Supreme Court has made clear that "the meaning of 'an adjudication under section 554' is unambiguous in the context of the EAJA" and refers only to "proceedings . . . 'subject to' or 'governed by' § 554." *Ardestani*, 502 U.S. at 135. In other words, an agency proceeding is an "adversary adjudication" for EAJA purposes only if it is actually governed by the APA's formal adjudication requirements, as opposed to, for example, the similar requirements of another statute or regulation. Thus, EAJA did not apply to the deportation proceedings at issue in *Ardestani*, which were governed by the Immigration and Nationality Act ("INA"). *Id.* at 133–35. The question we must answer, then, is whether the Service's administrative appeal process is governed by section 554.

Section 554 "generally applies where an administrative hearing is required by statute or the Constitution." *Aageson*

*Grain & Cattle v. U.S. Dep't of Agric.*, 500 F.3d 1038, 1044 (9th Cir. 2007). Plaintiffs acknowledge that the "statutes governing grazing on Forest Service allotments do not expressly require adjudications to be decided on the record after opportunity for agency hearing." The administrative appeal process in this case was prescribed not by statute but by Service regulations, specifically, 36 C.F.R. part 214.

Plaintiffs contend, however, that they had a constitutional right to be heard before their permits were suspended and that section 554 therefore applied to their administrative appeal. They rely for this argument on cases holding that when regulated parties have a due process right to an administrative hearing, the agency must observe the APA's formal adjudication procedures. *Wong Yang Sung v. McGrath*, 339 U.S. 33, 51 (1950), for example, held, before the INA provided for deportation hearings before an independent adjudicator, that due process requires an administrative hearing before an immigrant can be deported, and that the APA's formal adjudication procedures were therefore applicable. And *Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 936 (9th Cir. 1998), followed *Adams v. Witmer*, 271 F.2d 29, 32–33 (9th Cir. 1958), which held that the APA applied to the adjudication of rights under the General Mining Law of 1872.

*Wong Yang Sung* and *Adams* predate *Mathews v. Eldridge*, 424 U.S. 319 (1976), whose balancing test "has 'become the standard for determining whether certain challenged administrative procedures comply with the requirements of due process.'" *Collord*, 154 F.3d at 937 (quoting *Girard v. Klopfenstein*, 930 F.2d 738, 742 (9th Cir. 1991)). *Collord*, following *Adams*'s holding that section 554 applies to mining claim contest proceedings, concluded that those proceedings are "governed by" section 554 for EAJA

purposes. *Id.* at 936. But *Collord* did not address whether due process *required* the Department of the Interior to apply section 554 to mining claim proceedings, because the parties in *Collord* agreed that those proceedings were in fact "conducted in accordance with the terms of § 554," and there was "no issue as to the constitutional adequacy of those proceedings." *Id.* at 937.

*Wong Yang Sung*, *Adams*, and *Collord* do not apply here because the administrative review processes applicable here do not mimic those set out in the APA and, as we have already held, due process does not require that they do so. *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1084 (9th Cir. 2010). *Buckingham*, applying *Mathews*, examined the same administrative appeal process at issue here. Under the Service's regulations, that process allows parties to present written arguments and make oral presentations. *See* 36 C.F.R. §§ 214.8, 214.16; *Buckingham*, 603 F.3d at 1084. Unlike administrative hearings governed by section 554, "[o]ral presentations are not evidentiary proceedings involving examination and cross-examination of witnesses and are not subject to formal rules of procedure." 36 C.F.R. § 214.16(b). *Buckingham* rejected the plaintiff's argument that "an evidentiary hearing and cross-examination were necessary." 603 F.3d at 1083. The Service's process adequately gave the plaintiff "the opportunity to present . . . his case," *Buckingham* held, and "the adjudicator was able to consider, and did consider, the evidence presented by both" the plaintiff and the Service, "resulting in the adjudicator making an informed decision." *Id.* at 1084. Because the plaintiff had an "opportunity to be heard at a meaningful time and in a meaningful manner," the requirements of due process were satisfied. *Id.*; *see Mathews*, 424 U.S. at 333.

Here, Plaintiffs do not contend—nor could they, in light of *Buckingham*—that the Service's administrative appeal procedures deprived them of due process. They assert, instead, that they had *some* due process right to be heard, and that the Service's appeal process is therefore governed by section 554—even though the specific procedures referenced in that section directly and by cross-reference are inapplicable. But again, unlike the proceedings in *Collord*, Plaintiffs' administrative appeal was not in fact conducted in accordance with the terms of 5 U.S.C. § 554. And, as *Buckingham* held, there was no statutory *or* constitutional requirement that it be so conducted. In these circumstances, we cannot say the administrative appeal was "'governed by' § 554." *Ardestani*, 502 U.S. at 135.

The administrative appeal was therefore not an "adversary adjudication" for purposes of EAJA. *Id.* at 139. The Service properly denied Plaintiffs' request for attorney's fees for their administrative appeal.

**CONCLUSION**

The Service lawfully applied the 1995 Riparian Mitigation Measures to Plaintiffs' grazing permits and properly denied Plaintiffs' request for attorney's fees for their administrative appeal. We therefore reverse the district court's grant of partial summary judgment to Plaintiffs and remand with instructions to grant summary judgment to the Service.

**REVERSED AND REMANDED.**

**APPENDIX**

Case: 19-35351, 11/04/2019, ID: 11487944, DktEntry: 20-3, Page 108 of 239

APPENDIX A

INTERIM
RIPARIAN MITIGATION MEASURES
DEERLODGE NATIONAL FOREST
September 14, 1995

**INTRODUCTION:**  Not too long ago brushy riparian vegetation was viewed mainly as an obstruction.  Willows have been burnt and pulled throughout southwest Montana to provide more room for more palatable forage.  With more knowledge, however, our concepts have changed.  Today it is recognized that riparian zones support a host of ecological and social functions.

Major emphasis is now being placed on riparian conditions in relation to livestock grazing on federally administered lands.  The Beaverhead National Forest has done pioneering work in drafting and implementing riparian guidelines.  The Helena National Forest's "Riparian Guidelines for Grazing" provides a fine explanation of the principles and terminology of riparian condition.  The Deerlodge Forest mitigation measures borrow freely from work done on our neighboring forests.  The Deerlodge mitigation measures adopt the inherent stability of vegetative communities and the measurement parameters of the Beaverhead, the resiliency/resistance matrix of the Helena, and the thoughtful explanations of each.

**GOAL:**  These mitigation measures were developed as an interim step to assist the Forest in maintaining or moving toward riparian desired conditions.  Generally the desired conditions are to restore and maintain the historical extent and function of riparian areas where possible, considering their inherent characteristics (physical and biological) and their existing conditions and functionality.  Additional desired conditions may be developed for specific landscape analysis areas and watersheds on the Forest.  These measures are intended to meet the Riparian Management Objectives listed in the Inland Native Fish Strategy.

**BASICS:**  The riparian mitigation measures use four measurable parameters to determine the appropriate level of livestock grazing in riparian areas.  The four parameters are:

   **streambank disturbance** - physical alteration of the bank by any means

   **stubble height** - the height of standing herbaceous vegetation at the water's edge

   **woody browse use** - the percent use of current year's leaders, below 6 1/2 feet, of willow, aspen, dogwood, and other species used by livestock and wildlife

   **riparian herbaceous utilization** -  the percent of total weight of key riparian species utilized by livestock in the floodplain or on the adjacent terrace

36

**E.R. 382**

004903

Case: 19-35351, 11/04/2019, ID: 11487944, DktEntry: 20-3, Page 109 of 239

Allowable disturbance and utilization levels are tailored to each stream reach depending on the inherent stability of its vegetative community and the reach's resiliency/resistance.

RIPARIAN COMMUNITY STABILITY:  In an effort toward simplification, three riparian community stability classes were developed using the values presented in the Beaverhead riparian guidelines.  First the community types were grouped according to dominant life form, i.e. trees vs. shrubs.  A second grouping combined life forms into similar classes based on inherent stability.

The three community stability classes are:

Conifers, shrubs, and sedges have the highest inherent stability.  These communities include riparian conifer types; shrub types that include all willows, dogwood, birch, alder; sedge types (excluding Nebraska sedge); and spike rush, bulrush, and cattails.  Average streambank stability for these communities is 88.  That is, under natural conditions, an average of 88 percent of the stream channel would be stable.

Deciduous trees and native grasses are the moderate inherent stability group.  Deciduous trees include cottonwood and aspen trees; native grasses or grass-like plants include such species as tufted hairgrass, bluejoint reedgrass, Nebraska sedge, Baltic rush, and northern mannagrass.  Average inherent stability values for these communities is 62 percent.

Introduced grasses, sagebrush, shrubby cinquefoil, and other herbaceous are the lowest inherent stability.  Grasses include introduced moist site species such as bluegrasses and timothy; dryland grasses such as Idaho fescue and cheatgrass.  Herbaceous plant species include horsetails and introduced species such as dandelion, European clovers, spotted knapweed, Canada thistle, and musk thistle.  Sagebrush species most commonly encountered is big sagebrush, Artemisia tridentata.  Average inherent stability values for these communities is 40 percent.

RESILIENCY/RESISTANCE:  Landtype association resiliency/resistance refers to the interrelated abilities of a riparian area to recover once disturbed and remain unchanged while withstanding disturbance.  This capacity is a factor of parent material, landforms, soils, existing vegetation, and stream characteristics.  The range for this feature is extensive on the Deerlodge National Forest due to the variety of parent materials, landforms, and disturbance histories.  Even so, useful groups are created with only three divisions:

Systems with high resiliency/resistance are those typically having steep or very steep valley bottom gradients with small to large boulder size streambed materials dominant and considerable exposed bedrock.  Geology can vary.  Streams are typically ephemeral at the highest elevations and intermittent or perennial at lower elevations.  The relative width of riparian vegetation is narrow; soils are mostly shallow.

**E.R. 383**

004904

Case: 19-35351, 11/04/2019, ID: 11487944, DktEntry: 20-3, Page 110 of 239

On the opposite end of the spectrum are **low resiliency/resistance systems** primarily in granitics or coarse-grained volcanics at mid-to-low elevations. Valley bottom gradients range from steep to gentle with high percentages of coarse sand and finer material. Streams are typically perennial and mostly of third or higher order. The width of riparian vegetation at lower gradients is moderate or wider, and soils are usually deep.

The largest group of this classification are the remaining possibilities found on the Forest. The **moderate resiliency/resistance systems** are typically found in limestones, metasedimentary, fine-grained volcanics, and mixed geologies. Elevation ranges are upper-to-lower, usually below glaciation. Valley bottom gradients are typically steep to gentle with streambeds of mixed sizes. Stream order is variable. The relative width of riparian vegetation varies with some wide valley floodplains, and soils are shallow to deep.

Table 1. Deerlodge National Forest Interim Riparian Mitigation Measures

| Vegetative Community | Parameter | RESILIENCY/RESISTANCE | | |
| --- | --- | --- | --- | --- |
| | | Low | Medium | High |
| Conifers | Stream Disturbance | 20% | 25% | 35% |
| Shrubs | Stubble Height * | 6-8-8 in | 5-6-7 in | 5-6-7 in |
| Sedges | Woody Utilization | 20% | 25% | 25% |
| | Forage Utilization | 35% | 40% | 40% |
| Deciduous | Stream Disturbance | 30% | 45% | 45% |
| Trees & | Stubble Height * | 6-8-8 in | 6-6-7 in | 5-6-7 in |
| Native | Woody Utilization | 20% | 20% | 25% |
| Grasses | Forage Utilization | 35% | 40% | 40% |
| Introduced | Stream Disturbance | 50% | 65% | 65% |
| Grasses, | Stubble Height * | 3-3-4 in | 2-2-3 in | 2-2-3 in |
| ARTTRI, | Woody Utilization | 20% | 20% | 25% |
| POTFRU & | Forage Utilization | 50% | 50% | 50% |
| other herb | | | | |

* Allowable stubble height at water's edge varies with season of grazing. Early season use (roughly June through mid-July) allows stubble heights to be reduced since regrowth is expected. Mid-season is considered to be mid-July through mid-August) and late season late season use is late August to the end of October.

Exceeding any one of the parameters is sufficient to require cattle to move from the area.

38

**E.R. 384**

004905